**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **FAIRWAY GROUP HOLDINGS** | : | |
| **CORP.**, *et al.*, | : | **Case No. 20-[_____] (___)** |
| | : | |
| Debtors.[1] | : | **(Joint Administration Pending)** |

--------------------------------------------------------------x

### DECLARATION OF ABEL PORTER
### PURSUANT TO RULE 1007-2 OF LOCAL BANKRUPTCY
### RULES FOR SOUTHERN DISTRICT OF NEW YORK

I, Abel Porter, make this declaration under 28 U.S.C. § 1746:

1.    I am the Chief Executive Officer of Fairway Group Holdings Corp. ("**Holdings**") and its debtor affiliates (collectively, the "**Debtors**" the "**Company**" or "**Fairway**"), and have served in this role since 2017. Prior to my employment at Fairway, I was employed at Smith's Food and Drug, where I served as President and subsequently as Chief Executive Officer during my tenure. I left Smith's Food and Drug in 1999 and I went on to serve as President of Sullivan Family of Companies from 2001 to 2014. I am currently also on the board of Associated Food Stores of Salt Lake City.

2.    On the date hereof (the "**Commencement Date**"), Holdings and its affiliated Debtors each commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544). The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027. Fairway Community Foundation Inc., a charitable organization, owned by Fairway Group Holdings Corp., is not a debtor in these proceedings.

familiar with Fairway's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of Fairway or advisors and counsel to Fairway, or my opinion based upon my experience, knowledge, and information concerning Fairway's operations, or the grocery and retail industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") for the purpose of apprising the Court and parties in interest of the circumstances that led to the commencement of these Chapter 11 Cases. I am authorized to submit this Declaration on behalf of Fairway. The Debtors have also submitted the *Declaration of Michael Nowlan Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* (the "**Nowlan Declaration**," and together with this Declaration, the "**First Day Declarations**") in support of the motions and applications that the Debtors have filed with the Court, including the "first day motions" (the "**First Day Pleadings**") which has been filed with this Court contemporaneously herewith.

4.      Section I provides an overview of these Chapter 11 Cases. Section II describes Fairway's business. Section III describes the circumstances that led to the commencement of the Chapter 11 Cases. Section IV describes Fairway's corporate and capital structure. Section V identifies the attached schedules of information required by Local Rule 1007-2.

WEIL:\97352314\1\44444.0008

## I.
## Overview[2]

5.      Fairway is a leading food retailing destination in the Greater New York City metropolitan area.  Fairway operates fourteen (14) supermarkets across the New York, New Jersey and Connecticut tri-state area, including two with freestanding wine and liquor stores (the Stamford and Pelham locations) and two with in-store wine and liquor stores (the Woodland Park and Paramus locations).  The Company's flagship store is located at Broadway and West 74th Street, on the Upper West Side of Manhattan, featuring a cafe, Sur la Route, and state of the art cooking school.  Fairway employs over 3,000 individuals, approximately 83% of whom are represented by unions (including approximately 2,280 employees represented by United Food and Commercial Workers International Union ("**UFCW**"), Local 1500, 127 employees represented by UFCW Local 1262, 140 employees represented by UFCW Local 371, and 23 employees represented by UFCW Local 1500 (Drivers) (together with UFCW Local 1500, UFCW Local 1262, UFCW Local 371, the "**Unions**").  Fairway is party to four (4) collective bargaining agreements (collectively, the "**CBAs**") with the various bargaining units of the Unions.  As of November 2019, Fairway's unaudited consolidated financial statements reflect total revenues of approximately $643.3 million and a net loss of approximately $65.8 million for the previous twelve month period and assets totaling approximately $158.9 million and liabilities totaling approximately $288.7 million.

6.      Fairway has commenced these Chapter 11 Cases to implement a strategic asset sale strategy (the "**Sale Strategy**").  The Sale Strategy is the foundation of these Chapter 11 Cases and is critical to maximizing recoveries for all creditors and preserving a significant

---

[2] Capitalized terms used but not defined in this overview section shall have the meanings ascribed to such terms in the Nowlan Declaration or respective First Day Pleadings, as applicable.

WEIL:\97352314\1\44444.0008

number of jobs.  Under the direction of a Special Committee of the Board of Directors comprised of two independent directors, the Sale Strategy has been developed with great care, thought, and planning.  Fairway has developed the Sale Strategy to drive value and offer the best opportunities to preserve as many jobs and accomplish as many going concern sales of their stores as possible.

7.    As described in further detail in the Moses Declaration filed contemporaneously herewith, in May 2019, PJ Solomon, L.P. ("**Solomon**"), was hired by the Company to serve as their investment banker, and since July 2019 Solomon has been actively marketing the Debtors' stores and the approximately 240,000 square foot production and distribution center (the "**PDC**") (and other related assets) for going concern sales in an organized prepetition bidding process, contacting over 80 potential buyers, including twenty-six (26) potential strategic buyers (the "**Prepetition Sale Process**").  On September 12, 2019, six (6) indications of interest were received for the acquisition of all or certain portions of the business, or a merger.  In the ensuing weeks, the Company and its advisors worked with interested parties to provide diligence and negotiate the potential bids.

8.    Ultimately, two parties emerged as potential stalking horse bidders.  After extensive negotiations with the bidders and deliberations with their advisors, the Debtors have entered into a stalking horse asset purchase agreement (the "**Stalking Horse APA**") with Village Supermarket, Inc. (the "**Stalking Horse Bidder**").  The Stalking Horse APA provides for the sale of five (5) stores and the PDC, for an aggregate purchase price of approximately $70 million (the "**Stalking Horse Bid**").  The Stalking Horse Bid is subject to higher or better offers in accordance with the Bidding Procedures (defined below).  The Debtors are continuing to engage with other interested parties as part of the sale process and may enter into transactions for the

WEIL:\97352314\1\44444.0008

sale of additional stores on a going concern basis or other assets during these Chapter 11 Cases pursuant to the Bidding Procedures.

9.    Although the Prepetition Sale Process has so far been successful, it has also confirmed to the Debtors that their businesses are not sustainable over the long term under the current cost structure.  No bidder has been willing to assume Fairway's liabilities—in particular, the Company's substantial labor and pension obligations—in connection with a purchase of Fairway's stores.  To the contrary, the Stalking Horse Bidder and all other bidders in the Prepetition Sale Process conditioned their purchase of the Debtors' assets free and clear of all liabilities, such as liabilities arising under or related to the CBAs, including the multi-employer contribution and withdrawal liabilities relating thereto.  That said, the Stalking Horse APA requires the Stalking Horse Bidder to negotiate with the Unions, in consultation with the Debtors, to try to reach agreement on terms of employment with affected employees.  The Debtors are hopeful that consensual agreements will be reached with their Unions.

10.    Given these and other considerations, Fairway has concluded in the exercise of their business judgment and as fiduciaries for all of the Company's stakeholders that the best and only viable path to maximize the value of their business and potentially preserve many jobs is a strategic chapter 11 filing to facilitate sales free and clear of liabilities.  It is the Company's judgment that if the Debtors cannot achieve free and clear sales within the required time periods prescribed by the RSA and the Milestones (each as defined below), all of the value that has been created and preserved through the Prepetition Sale Process may be lost, and the Debtors could be left with no choice but to liquidate their business in a fire sale and piecemeal fashion.

WEIL:\97352314\1\44444.0008

11.     Pursuant to the bidding procedures motion filed contemporaneously herewith (the "**Bidding Procedures Motion**"), the Debtors seek approval of uniform bidding and auction procedures (the "**Bidding Procedures**") for all of their stores, the PDC, and related assets (collectively, the "**Stores**"), including the Stores that are the subject of the Stalking Horse Bid.  Under the Bidding Procedures, interested parties will have the opportunity to bid for any of the Debtors' stores, either individually or on a package basis, whether or not a particular store or package of stores is included in a Stalking Horse Bid.  Interested parties are requested to submit bids to be submitted by February 28, 2020, in accordance with the Bidding Procedures.  As described in the Nowlan Declaration, given the current circumstances and the need for the Debtors to move as quickly as possible, the Bidding Procedures set forth an expedited bidding and sale process to implement the Sale Strategy.

12.     As stated, in advance of the chapter 11 filing, the Debtors worked closely with their major stakeholders, including an ad hoc committee of lenders (the "**Ad Hoc Group**") holding over 91% in the aggregate of all of the Company's outstanding loans under the Prepetition Credit Agreement (defined below) (and in excess of 66⅔% if each tranche of debt thereunder).  The lenders comprising the Ad Hoc Group (or their affiliates) also hold approximately 86% of the equity of Holdings (with the remaining approximately 14% of the equity being held by the lenders under the Prepetition Credit Agreement not included in the Ad Hoc Group), all of which was received in exchange for their debt claims in connection with Company's 2016 bankruptcy cases as discussed below.  None of the lenders (including lenders in the Ad Hoc Group) hold more than 35% of the equity of Holdings, and to my knowledge, none of the Debtors' officers or directors are affiliated with or employed by any of the lenders (including the lenders in the Ad Hoc Group).  On January 22, 2020, the Debtors executed a

WEIL:\97352314\1\44444.0008

restructuring support agreement (the "**RSA**") with the members of the Ad Hoc Group, pursuant to which the members of the Ad Hoc Group agreed to vote in favor of and support confirmation of a chapter 11 plan incorporating the terms embodied by the term sheet annexed to the RSA (the "**Plan**"), attached hereto as **Exhibit B**. The Debtors are in the process of negotiating the Plan with the Ad Hoc Group and intend to file the Plan in the near term to expedite the Chapter 11 Cases.

13. As stated, in support of the Debtors' chapter 11 filing, the Ad Hoc Group has agreed to provide the Debtors with an up to $25 million debtor-in-possession new money credit facility (together, the "**DIP Facility**") to support the Debtors' liquidity during the chapter 11 cases. As described in further detail in the Nowlan Declaration, the DIP Facility, together with the consensual use of cash collateral, should provide the Debtors with sufficient liquidity to implement the Sale Strategy in an orderly and value-maximizing manner.

14. While the DIP Facility provides the liquidity needed to carry out the Sale Strategy, it cannot be emphasized enough that time is of the essence. Given the significant costs associated with continued operations, the DIP Credit Agreement and RSA set forth milestones (the "**Milestones**") by which the Debtors must accomplish various objectives in an expeditious manner. In particular, the Milestones include, among others, the following:[3]

| Milestone | Deadline |
|---|---|
| *Sale Process Milestones* | |
| Entry of the order approving the Bidding Procedures | 25 days following the filing of the Bidding Procedures Motion (February 17, 2020) |
| Commence Auction, if applicable, for | 50 days from the Commencement Date |

---

[3] The foregoing is only a summary of certain Milestones. The Milestones described herein are qualified in their entirety by the Milestones described in the DIP Credit Agreement and the milestones described in the RSA.

| | |
|---|---|
| the Stalking Horse Package | (March 13, 2020) |
| Entry of Sale Order approving sale of the Stalking Horse Package, if no overbid for the Stalking Horse Package | 50 days from the Commencement Date (March 13, 2020) |
| Consummation of the sale(s) of the Stalking Horse Package, if no Auction held for Stalking Horse Package | 55 days from the Commencement Date (March 18, 2020) |
| Entry of Sale Order approving sale of the Stalking Horse Package, if overbid received for the Stalking Horse Package | 65 days from the Commencement Date (March 28, 2020) |
| Commence Auction for the Other Assets | 55 days from the Commencement Date (March 18, 2020) |
| Consummation of the sale(s) of the Stalking Horse Package to the winning bidder(s) at the Auction, if applicable | 68 days from the Commencement Date (March 31, 2020) |
| Entry of Sale Order approving sale of the Other Assets, if applicable | 65 days from the Commencement Date (March 28, 2020) |
| Consummation of the sale(s) of the Other Assets to the winning bidder(s) at the Auction, if applicable | 70 days from the Commencement Date (April 2, 2020) |
| *Plan Milestones* | |
| File Plan | 30 days from the Commencement Date (February 22, 2020) |
| File Disclosure Statement | 30 days from the Commencement Date (February 22, 2020) |
| Entry of the Order approving the Disclosure Statement | 65 days from the Commencement Date (March 28, 2020) |
| Entry of the order confirming the Plan | 120 days from the Commencement Date (May 22, 2020) |
| Effective date of the Plan | 125 days from the Commencement |

8

| | Date (May 27, 2020) |
|---|---|

15.     Given the foregoing, it is imperative that the parties cooperate with one another and that negotiations be conducted as expeditiously as possible.  While the Debtors are committed to pursuing consensual resolutions with their unions where possible, if consensual resolutions cannot be quickly achieved within the deadlines set forth in the Milestones and the Stalking Horse APA, the Debtors will be required to commence proceedings under sections 1113 and 1114 of the Bankruptcy Code.  The Debtors believe that all constituents, including the employees, will benefit from this chapter 11 proceeding over any other alternatives and, as a result, must maintain the timeline presented to achieve the necessary relief and maximize value for all stakeholders.

## II.
## Fairway's Businesses

### A.     History and Current Business Operations

16.     Fairway is a food retailer offering customers a differentiated one-stop shopping experience "Like No Other Market."  Since beginning as a small neighborhood market in the 1930s, Fairway established itself as a leading food retailer in the Greater New York City metropolitan area.  Fairway's stores emphasize an extensive selection of fresh, natural, and organic products, prepared foods, and hard-to-find specialty and gourmet offerings, along with a full assortment of conventional groceries.

17.     As described above, Fairway operates fourteen (14) stores across the New York, New Jersey and Connecticut tri-state area.  Fairway also operates the PDC, a production and distribution center and state-of-the-art central commissary, bakery and produce distribution site with the ability to support up to thirty (30) Fairway Market stores.  The approximately 240,000 square foot facility includes a full line bakery, cafe and specialty warehouse.  The PDC

helps Fairway with housing their imports and cheeses and is a cabinet facility housing Fairway's customer service and training centers, store development team, and centralized catering operation. The facility also services outside customers and is a manufacturer for other grocery stores, and serves companies supplying airports and restaurants in the tri-state area.

18.    The Company leases all of its store operations from various landlords. The Company pays approximately $3.5 million per month in rent on its leased real property, inclusive of real property taxes, common area maintenance, and insurance. For each location, a Fairway subsidiary is the lessee. Holdings or Fairway Acquisition guarantee some but not all of the leases, and certain leases are supported by letters of credit that are cash collateralized with proceeds from the Prepetition Credit Agreement.

19.    The Debtors' operating cash flow depends on their ability to provide customers with high volumes of fresh, high quality, food, beverage, and other products without interruption. Fairway stores offer an extensive selection of natural and organic products, prepared fresh foods and hard to find specialty and gourmet items, along with an unparalleled variety of meats, cheeses and produce. Fairway has also embraced grocery delivery through partnering with delivery services and has introduced the grocery technology that lets shoppers use the Fairway-branded mobile checkout app to scan products with their phone cameras. The Debtors experience a high turnover of inventory due to the perishability of certain merchandise that must be replaced quickly to satisfy customer demand and ensure that the Debtors' shelves do not suddenly go barren.

20.    In the 52 weeks ending December 1, 2019, the Debtors reported approximately $643.3 million in sales and gross profit of $227 million. The Debtors reported aggregate adjusted EBITDA of $23 million over this same period, but the Debtors lost

WEIL:\97352314\1\44444.0008

approximately $68.8 million during the same period as a result of depreciation, amortization, interest expense, other operating costs associated with supporting their fourteen (14) stores with a declining sales base, and additional costs to close operations at the Nanuet location.

## III.
## The Need for Chapter 11 Relief and the
## Circumstances Leading to Commencement of These Chapter 11 Cases

21.    As stated, the Debtors are filing the Chapter 11 Cases to implement the Sale Strategy, which is critical to achieving the Debtors' goals of maximizing creditor recoveries, providing for an equitable distribution to the Debtors' stakeholders, and protecting the interests of its approximately 3,000 employees as best as possible.

### A.    The 2016 Cases

22.    Unfortunately, this is Fairway's second chapter 11 filing in four (4) years. In June 2016, the Company emerged from chapter 11 following a prepackaged chapter 11 case that adjusted its capital structure and paid all general unsecured creditors in full with no impact on Fairway's union and pension obligations.[4]  The Company's prior third party lenders converted a substantial portion of their debt to substantially all of the reorganized equity of Fairway and also received take back debt.  Since the Company's emergence, market pressures and other issues discussed herein have continued to be a drain on the Company.  Despite the support of the Company's new owners and lenders—who have provided additional financing to the company of approximately $37 million in the aggregate, appointed industry experts to the board, brought in a new management team, never took any distributions or management fees, and supported the Company's balance sheet by permitting the Company to pay the substantial majority of the interest accruing under the Prepetition Credit Agreement "in kind" by capitalizing interest owed

---

[4] An order closing the cases was entered on December 23, 2016. *In re Fairway Group Holdings Corp.*, Case No. 16-11241 (Bankr. S.D.N.Y. June 6, 2016) (ECF No. 237).

WEIL:\97352314\1\44444.0008

thereunder—the Company can no longer operate without the protections of chapter 11. As stated, the Company's prepetition lenders remain supportive of Fairway and have entered into a restructuring support agreement and agreed to finance these chapter 11 cases with a DIP Facility of up to $25 million.

23.     More specifically, under the 2016 prepackaged plan, Fairway's then-existing secured creditors received (i) 100% of equity of the reorganized Company (subject to dilution by up to 10% by a management incentive program), (ii) a $45 million last out exit term loan (the "**Last Out Exit Term Loan**") with Fairway Acquisition as borrower and each of the other Fairway subsidiaries as guarantors, secured by all of the assets of Fairway, and (iii) a $39 million unsecured subordinated term loan (the "**Subordinated Term Loan**") with Holdings as borrower, but which was not guaranteed by the other Fairway subsidiary entities. The 2016 prepackaged plan was confirmed in June 2016. *In re Fairway Group Holdings Corp.*, (Bankr. S.D.N.Y. June 8, 2016) (ECF No. 156). In August 2018, the facilities existing upon exit from the 2016 chapter 11 cases, including the Last Out Exit Term Loan and the Subordinated Term Loan were either repaid in full or otherwise converted into loans under the Prepetition Credit Agreement.

B.     **The 2018 Rescue Financing**

24.     As noted, following Fairway's emergence from chapter 11 in June 2016, Fairway continued to face headwinds in the market, which have continued to this date and are described in further detail in the following section. As a result, the Company required and obtained rescue financing from certain of their Prepetition Lenders in August 2018, resulting in execution of the Prepetition Credit Agreement, whereby certain of the Prepetition Lenders provided the Company the $14.5 million Super Senior Secured Term Loan Facility and $22.66 million Super Senior Secured L/C Facility (each as defined below).

WEIL:\97352314\1\44444.0008

C.    **Competitive Industry**

25.    The food retail industry as a whole, particularly in the Greater New York City metropolitan area, is highly competitive, and increasingly so in recent years.  According to the Food Marketing Institute, the percentage of American consumers who called supermarkets their "primary grocery store" has fallen from 67% in 2005 to 49% in 2018.[5]  Fairway experiences competitive pressures across multiple market segments including from local, regional, national and international supermarket grocers such as Stop & Shop (owned by Royal Ahold), Whole Foods, Aldi, Trader Joe's, King Kullen, Gristede's, Citarella, Save-A-Lot and Lidl, convenience stores such as 7-Eleven, dollar stores such as Dollar General and Dollar Tree, retail drug chains such as CVS, Walgreens and Rite Aid, supercenters such as Walmart and Target, club stores such as Costco, BJ's and Sam's, and numerous independent and specialty stores.  The Company also faces rapidly intensifying competition from well-capitalized online retail grocery giants such as Amazon, Walmart, and Target, as well as local online grocers such as FreshDirect and Peapod and meal-kit operators like Blue Apron and Hello Fresh.  According to Coresight Research, nearly 40% of Americans bought groceries online in 2019, up from under 30% in 2018.[6]  Finally, given the Company's extensive prepared and fresh food offering, it competes directly with countless full service, casual dining, fast casual, quick service restaurants, many of which offer free delivery; specialty coffee shops such as Starbucks and other specialty food retailers, particularly in Manhattan.  In addition, some of Fairway's competitors have expanded aggressively in marketing a range of natural and organic foods, prepared foods and quality specialty grocery items.  Some of Fairway's competitors have more experience operating

---

[5] FMI, U.S. Grocery Shopper Trends 2018, (2018).

[6] Coresight Research, US Online Grocery Survey 2019, (2019).

multiple store locations and have greater financial or marketing resources than Fairway, which allow them to devote greater resources to sourcing, promoting, and selling their products. The density of the Greater New York City metropolitan area compounds the problem because of the geographic proximity between Fairway's stores and those of their competitors.

26.     The scale advantages that extremely large grocers, such as Amazon, Walmart, Target, Costco, BJ's, Stop & Shop (Ahold), CVS, Walgreens, Aldi, Lidl, Dollar General and Dollar Tree have over regional grocers like Fairway cannot be overstated. These larger grocers all have investment grade credit ratings, which makes their cost of capital meaningfully lower and affords them extraordinary capacity to invest in lower prices, higher wages, more advertising, more effective modern technology and further growth, all of which enhance the probability a consumer will become and remain their customers. Fairway's comparable store sales decreased approximately 5% in the fifty-two (52) weeks ended January 12, 2020 compared to the fifty-two weeks ended January 13, 2019.

27.     Additionally, as discussed above, approximately 83% of the Company's workforce is unionized. The workforces of some of the Company's most significant competitors are not unionized, resulting in lower labor, pension, and benefit costs than the Company faces. As a result, these competitors can offer lower prices to their customers, putting pressure on the Company to do the same, further reducing the Company's profit margin. Non-union grocers also generally have more free cash flow to invest in advertising and technology to drive customer traffic and loyalty.

### D.    Liquidity Constraints

28.     Although certain of of the Company's stores generate positive EBITDA, the Company is experiencing historically low EBITDA generation as a result of the industry pressures discussed above. The reduced EBITDA has increased the Company's leverage and has

14

imposed significant strains on the Company's liquidity and cash flows.    The strain on the Company's liquidity has been exacerbated by the costs associated with the Company's labor and pension costs, described below.

E.    **Inability to Make Capital Investments**

29.    Capital improvements and investment in operations are imperative for food retailers to keep pace with their competition.    Market participants are introducing technological advances and other initiatives to customize and improve consumer experience. Companies are also implementing cost-saving technologies and practices that allow them to further lower their prices, including in the areas of labor scheduling, ordering, receiving, payment processing, and data analytics.    Additionally, some of the Company's stores need renovations that would enhance customers' shopping experience and generate increased revenues.

30.    The Company's increased leverage and liquidity constraints, however, have impeded its ability to invest in store renovations and in other capital and operational expenditures at the level and speed at which the food industry is evolving.    Indeed, the Company did not undertake a substantial portion of the capital improvement projects and initiatives that it had previously planned to implement in 2019.    Furthermore, as discussed above, the grocery sector has recently been faced with significant headwinds, making it an inopportune time to raise capital to invest in the Company's business.

F.    **Labor and Pension Costs**

31.    The Debtors' cost structure includes certain employee and labor-related costs that have historically driven down their profit margins.    Pursuant to the CBAs, the Debtors are required to contribute to a multi-employer pension plan administered by a local United Food and Commercial Workers union, entitled the UFCW Local 1500 Pension Plan that also covers

15

collectively-bargained employees of certain unaffiliated entities ("**Pension Plan**").  The Debtors

also participate in a multiemployer health and welfare plan (the "**UFCW Local 1500 Welfare**

**Fund**") that provides benefits to employees represented by UFCW Local 1500, UFCW Local

371 and UFCW Local 1262.  The expenses for the UFCW Local 1500 Welfare Fund total

approximately $750,000 per month (or approximately $9 million in the aggregate in 2019), of

which the Company pays approximately 92% (approximately $8.3 million per year).

32.     The Pension Plan is currently underfunded in part due to increases in the

costs of benefits provided or paid under the plan as well as lower returns on plan assets.  As of

August 14, 2019, the Debtors were provided actuarial information that estimates that the present

value of unfunded benefits for the purposes of withdrawal liability is approximately $67 million.

The unfunded liabilities of this Pension Plan may require increased future payments by other

participating employers.  As a result, the Pension Plan has adopted a rehabilitation plan to

increase the plan's funding percentage.  The Debtors' payments on account of the Pension Plans

amount to $361,731 per month, which the Debtors have diligently paid over time until shortly

prior to filing these Chapter 11 Cases, when liquidity became severely restricted.

33.     The CBAs also mandate wage increases each year irrespective of sales.

The company's average hourly wage increased from $13.20 in Fiscal Year 2018 to $14.46 in

Fiscal Year 2019 and to an expected $15.78 in Fiscal Year 2020, an increase of approximately

20%.

34.     The Debtors also maintain third-party workers' compensation insurance

for all fourteen (14) of their stores (collectively, the "**Workers' Compensation Program**").

The Debtors estimate that the pay approximately $4.5 million per year for premiums in

connection with the Workers' Compensation Program.

WEIL:\97352314\1\44444.0008

**IV.**
**Corporate and Capital Structure**

**A.    Corporate Structure**

35.    As the Debtors are privately-held companies, none of the Debtors' equity securities have been publicly-traded since emerging from the 2016 chapter 11 cases. Holdings was founded in September 2006 as a Delaware corporation. Holdings is the direct corporate parent of Fairway Group Acquisition Company ("**Fairway Acquisition**"), also formed in September 2006 as a Delaware corporation. A separate Delaware limited liability company houses each individual Fairway grocery market. Fairway Acquisition is the sole equity holder of each of these limited liability companies. Thus, all of the Debtors are direct or indirect subsidiaries of Holdings. An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit A**.

36.    As of the Commencement Date, the outstanding equity interests in Holdings are currently held (either directly and/or through subsidiaries or affiliates) approximately 33.6% by funds or entities affiliated with or managed by Brigade Capital Management, LP, approximately 29.9% by Goldman Sachs & Co, approximately 22.2% by funds or entities affiliated with or managed by FS KKR Capital Corp., with certain other holders each holding approximately 5% or less of the remaining 14.3% of the equity in Holdings.

37.    Holdings' current board of directors is comprised of the following five (5) members, including two (2) independent directors:

| Name | Position |
|------|----------|
| Ken Martindale | Chairman of the Board |
| Errol Schweizer | Director |
| Tom Furphy | Director |

WEIL:\97352314\1\44444.0008

| Name | Position |
|------|----------|
| Eugene Davis | Director (independent) |
| Neal Goldman | Director (independent) |

38.    To the best of my knowledge, none of the members of the board of directors are affiliated with or employed by any of the Company's shareholders or lenders.

39.    Fairway's current senior management team is comprised of the following individuals:

| Name | Position |
|------|----------|
| Abel T. Porter | Chief Executive Officer |
| Brad Schneider | Chief Financial Officer |
| Maureen P. Page | Senior Vice President—Finance |
| Nathalie Augustin | Senior Vice President—General Counsel |

40.    To the best of my knowledge, none of the Company's senior management are affiliated with or employed by any of the Company's shareholders or lenders.

41.    Prior to commencing these Chapter 11 Cases, the Company took measures to ensure a seamless transition into chapter 11.  First, the Company appointed a new independent director to its Board of Directors (the "**Board**"):  Neal P. Goldman, Managing Member of SAGE Capital Investments.  The Company now has two independent directors, Mr. Goldman and Eugene Davis, Chairman and Chief Executive Officer of PIRINATE Consulting Group, LLC.  These individuals bring decades of restructuring and operational turnaround and transformation experience to the Company.  Second, the Board formed a special committee (the "**Special Committee**"), composed solely of its two independent directors, Mr. Goldman and Mr. Davis, to oversee the Company's restructuring process.  In addition, effective upon to the Commencement

WEIL:\97352314\1\44444.0008

Date, Michael Nowlan of Mackinac Partners was appointed Chief Restructuring Officer ("**CRO**") of each of the Debtors.

42.    Additional information regarding the Debtors' senior management team is set forth in **Schedule 10** annexed hereto.

### B.    Capital Structure

43.    As of the Commencement Date, the Debtors' have outstanding funded debt obligations in the amount of approximately $227.2 million in the aggregate under the Prepetition Credit Agreement, consisting of (i) approximately $16 million outstanding under the Super Senior Secured Term Loan Facility; (ii) approximately $26.8 million outstanding under the Super Senior Secured L/C Facility, (iii) approximately $76.5 million outstanding under the Senior First Out Term Loan; (iv) approximately $56.8 million outstanding under the Senior Last Out Term Loan, and (v) approximately $51 million outstanding under the Holdco Loan (each as defined below).    The Debtors' secured financing obligations are described in greater detail below.

(1)    *Super Senior Secured Facilities*

44.    <u>Super Senior Secured Term Loan Facility</u>.    Pursuant to that certain Super Senior Credit Agreement, dated as of August 28, 2018 (as amended or modified by that certain First Amendment to Super Senior Credit Agreement, dated as of July 29, 2019, that certain Second Amendment to and Extension under Super Senior Credit Agreement, dated as of August 28, 2019, that certain Third Amendment and Limited Waiver to Super Senior Credit Agreement, dated as of October 7, 2019, and that certain Limited Waiver to Super Senior Credit Agreement, dated as of January 8, 2020, and as may be further amended, supplemented, or modified from time to time, the "**Prepetition Credit Agreement**"), among Fairway Acquisition, Holdings, the lenders from time to time party thereto (each, a "**Prepetition Lender**", and collectively, the

19

"**Prepetition Lenders**") and Ankura Trust Company, LLC, as administrative agent and collateral agent for the Prepetition Lenders, certain Prepetition Lenders provided Fairway Acquisition with a super senior secured delayed draw first out term loan in the aggregate principal amount of $14.5 million (the "**Super Senior Secured Term Loan Facility**").  The Super Senior Secured Term Loan Facility matures on August 28, 2023.  As of the date hereof, the aggregate amount outstanding under the Super Senior Secured Term Loan Facility is approximately $16 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.  The Super Senior Secured Term Loan Facility is pari passu in priority with the Super Senior Secured L/C Facility (as defined below), and represents (together with the Super Senior Secured L/C Facility) the Debtors' senior-most tranche of prepetition funded debt.

45.    Super Senior Secured L/C Facility.  The Prepetition Credit Agreement also provided for a super senior secured credit facility in the aggregate principal amount of $22.66 million (the "**Super Senior Secured L/C Facility**") provided by certain of the Prepetition Lenders to Fairway Acquisition for the purpose of cash collateralizing letters of credit issued by third-party issuers (i.e., entities that are not lenders under the Prepetition Credit Agreement) for the benefit of certain landlords, vendors, and other creditors of the Company. The Super Senior Secured L/C Facility matures on August 28, 2023.  As of the date hereof, the aggregate amount outstanding under the Super Senior Secured L/C Facility is approximately $26.8 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.  As set forth above, the Super Senior Secured L/C Facility is pari passu in priority with the Super Senior Secured Term Loan Facility (as defined below), and represents (together with the Super Senior Secured Term Loan Facility) the Debtors' senior-most tranche of prepetition funded debt.

WEIL:\97352314\1\44444.0008

(2)    *Senior First Out Term Loan*

46.    The Prepetition Credit Agreement also provided for secured first out term loans in the aggregate principal amount of approximately $65.14 million (the "**Senior First Out Term Loan**") provided by certain of the Prepetition Lenders to Fairway Acquisition.  The Senior First Out Term Loan matures on November 28, 2023.  As of the date hereof, the aggregate amount outstanding under the Senior First Out Term Loan is approximately $76.5 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.  The Senior First Out Term Loan is junior in priority to the Super Senior Secured Term Loan Facility and the Super Senior L/C Facility (but senior in priority to the Senior Last Out Term Loan (as defined below)).

(3)    *Senior Last Out Term Loan*

47.    The Prepetition Credit Agreement also provided for secured last out term loans in the aggregate principal amount of approximately $49.7 million (the "**Senior Last Out Term Loan**") provided by certain of the Prepetition Lenders to Fairway Acquisition.  The Senior Last Out Term Loan matures on November 28, 2023.  As of the date hereof, the aggregate amount outstanding under the Senior Last Out Term Loan is approximately $56.8 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.  The Senior Last Out Term Loan is junior in priority to the Super Senior Secured Term Loan Facility, the Super Senior L/C Facility, and the Senior First Out Term Loans.

(4)    *Holdco Loan*

48.    Lastly, the Prepetition Credit Agreement also provided for secured term loans in the aggregate principal amount of approximately $44 million (the "**Holdco Loan**," and together with the Super Senior Secured Term Loans, Super Senior Secured L/C Loans, Senior First Out Term Loans, and the Senior Last Out Term Loans, the "**Prepetition Secured Loans**")

provided by certain of the Prepetition Lenders to Holdings, which Fairway Acquisition is also obligated to repay.  The Holdco Loan matures on February 24, 2024.  As of the date hereof, the aggregate amount outstanding under the Holdco Loan is approximately $51 million in unpaid principal ,plus accrued and unpaid interest, fees, and other expenses.  The Holdco Loan is junior in priority to the Super Senior Secured Term Loan Facility, the Super Senior L/C Facility, the Senior First Out Term Loan, and the Senior Last Out Term Loan.

(5)   *Prepetition Security Agreement*

49.   The obligations under the Prepetition Credit Agreement are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of a Super Senior Guarantee and Collateral Agreement, dated as of August 28, 2018 (as amended, supplemented, or modified from time to time, the "**Prepetition Security Agreement**").  Pursuant to the terms of the Prepetition Security Agreement, each Debtor granted liens on substantially all of its assets (with certain specified exceptions) including, but not limited to, all accounts, chattel paper, cash and deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights, commercial tort claims and certain other personal property and real estate.

(6)   *Trade Claims*

50.   In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (the "**Trade Claims**") to various third-party providers of goods and services (the "**Trade Creditors**") that are sold in the Debtors' stores or facilitate the Debtors' business operations.  As of January 10, 2020, the Debtors estimate that the aggregate amount of Trade Claims outstanding is approximately $15.3 million.  A majority of the Debtors' General Unsecured Claims are Trade Claims.  Certain of the Trade Claims are entitled to statutory priority, such as under PACA or PASA or under section 503(b)(9) of the

Bankruptcy Code, may give rise to shippers, warehouseman, or mechanics liens against the Debtors' property if unpaid, relate to funds held in trust by the Debtors that are not the property of the Debtors' estates, or are secured by letters of credit, security deposits, or rights of setoff (collectively, the "**Priority Trade Claims**").  Excluding the Priority Trade Claims, the Debtors estimate that the total Trade Claims equal approximately $2.3 million (the "**Non-Priority Trade Claims**").

  (7) *Intercompany Claims*

  51. Certain Fairway entities hold Claims against Debtor entities resulting primarily from the normal functioning of Fairway's centralized cash management system as well as, in some cases, the provision of intercompany services by one Fairway entity to another Fairway entity, such as, for example, administrative support services.  Historically, such intercompany claims are recorded in Fairway's books and records but not paid.

**V.**

**Information Required by Local Rule 1007-2**

  52. In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

  53. Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any official committee organized prior to the Commencement Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

  54. Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders.

WEIL:\97352314\1\44444.0008

55.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

56.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates.

57.     Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

58.     Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

59.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

60.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

WEIL:\97352314\1\44444.0008

61.     Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

62.     Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

63.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

64.     Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 23rd day of January, 2020

/s/ Abel Porter
Abel Porter
Chief Executive Officer

Fairway Group Holdings Corp. and
its Affiliated Debtors

26

**Exhibit A**

**Capital and Corporate Organization Chart**



FAIRWAY
LIKE NO OTHER MARKET®

**Outstanding Funded Indebtedness[1]**

| | |
|---|---|
| Senior Debt: | Outstanding |
| L/C Loans | $26.8mm |
| New Term Loans | $16.0mm |
| | $42.8mm |
| Senior First Lien Term Loan: | $76.5mm |
| Senior Last Out Term Loan: | $56.8mm |
| Holdco Loan: | $51.0mm |
| **Total Secured Debt** | **$227.2mm** |

**Companies Party to the Credit Agreement**

**Borrower**: Fairway Group Acquisition Co., a Delaware corporation
**Holdings**: Fairway Group Holdings Corp., a Delaware corporation

**Classes of Loans Under the Credit Agreement[2]**

**L/C Loans**

**Outstanding Amount**: $26.8mm
**Interest Rate**: 15.0% (11.0% PIK'd / 4.0% cash pay)
**Maturity Date**: Earlier of 8/28/23 and the Springing Maturity Date[2]
**Collateral:** Substantially all assets, subject to limited exclusions

**New Term Loans**

**Outstanding Amount**: $16mm
**Interest Rate**: 15.0% (11.0% PIK / 4.0% cash pay)
**Ticking Fee**: 3.0% on undrawn amounts[3]
**Maturity Date**: Earlier of 8/28/23 and the Springing Maturity Date
**Collateral:** Substantially all assets, subject to limited exclusions

**Senior First Out Term Loans**

**Outstanding Amount**: $76.5mm
**Interest Rate**: (i) if paid in cash, L+ 8.0% or (ii) if PIK'd (at the election of the Borrower), 12%
**Maturity Date**: Earlier of 11/28/23 and the Springing Maturity Date
**Collateral:** Substantially all assets, subject to limited exclusions

**Senior Last Out Term Loans**

**Outstanding Amount**: $56.8mm
**Interest Rate**: (i) if partially PIK'd and partially paid in cash, 9.0% (4.5% PIK'd / 4.5% cash pay) or (ii) if 100% PIK'd (at the election of the Borrower), 10.0%
**Maturity Date**: Earlier of 11/28/23 and the Springing Maturity Date
**Collateral:** Substantially all assets, subject to limited exclusions

**Holdco Loans**

**Outstanding Amount**: $51.0mm
**Interest Rate**: (i) if partially PIK'd and partially paid in cash, 10.0% (6.0% PIK'd / 4.0% cash pay) or (ii) if 100% PIK'd (at the election of the Borrower), 11.0%
**Maturity Date**: Earlier of 2/24/24 and the Springing Maturity Date
**Collateral:** Substantially all assets, subject to limited exclusions

* Inactive Subsidiary

[1] Amount outstanding as of January 7, 2020 based on Lender Register provided by Ankura.

[2] "**Springing Maturity Date**" shall mean (i) July 3, 2019, if an aggregate amount exceeding $0 is outstanding under the Existing First Out Term Loan Facility and the Existing Last Out Term Loan Facility on such date and (ii) April 3, 2021, if an aggregate amount exceeding $0 is outstanding under the Existing Subordinated Holdco Facility on such date; provided that the Springing Maturity Date may be extended by the Required New Facilities Lenders, acting in their sole discretion.

[3] Scheduled to terminate August 28, 2020 (subject to change based on various triggers in "New Term Loan Delayed Draw Commitment Termination Date").

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

WEIL:\97352314\1\44444.0008

Execution Version

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "*Agreement*"), dated as of January 22, 2020, is entered into by and between:

(i)　　　Fairway Group Holdings Corp. ("*Fairway*"), and its direct and indirect debtor subsidiaries (each, a "*Company Party*" and collectively, the "*Company Parties*"); and

(ii)　　　Each undersigned Lender (each being a "*Consenting Creditor*," and together with their respective successors and permitted assigns and any subsequent Lender that becomes a party hereto in accordance with the terms hereof, the "*Consenting Creditors*")

Each Company Party, each Consenting Creditor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "*Parties*" and individually as a "*Party*."

**WHEREAS**, the Parties have agreed to the Restructuring Transactions (as defined herein) consistent with the terms and subject to the conditions set forth herein, including in the Term Sheet (as defined herein), which are the product of arms'-length, good faith discussions between the Parties and their respective professionals;

**WHEREAS**, as of the date hereof, the Consenting Creditors hold, or act as the nominee, investment adviser, sub-adviser, or investment manager to entities that hold, in the aggregate, (i) 100.00% of the aggregate outstanding principal amount of the L/C Facility Loans; (ii) 100.00% of the aggregate outstanding principal amount of the Super Senior Secured Term Loans; (iii) approximately 99.59% of the aggregate outstanding principal amount of the Senior First Out Term Loans; (iv) approximately 82.89% of the aggregate outstanding principal amount of Senior Last Out Term Loans; and (v) approximately 82.89% of the aggregate outstanding principal amount of the Subordinated Loans;

**WHEREAS**, the Company Parties have requested, and certain Consenting Creditors have agreed to provide the DIP Facility; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in this Agreement and in the Term Sheet.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.　　　Certain Definitions.

Capitalized terms used but not defined in this Agreement shall have the meaning ascribed to them in the restructuring term sheet attached hereto as **Exhibit A** (together with all schedules, exhibits,

and annexes attached thereto, and as may be modified in accordance with Section 9 hereof, the "*Term Sheet*").

As used in this Agreement, the following terms have the following meanings:

(a)      "*Ad Hoc Group*" means, collectively, the Consenting Creditors represented by King & Spalding LLP.

(b)      "*Administrative Agent*" means Ankura Trust Company, LLC, in its capacity as Administrative Agent under the Credit Agreement, and its successors and assigns.

(c)      "*Alternative Transaction*" means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company Parties or their assets other than the Restructuring Transactions.

(d)      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

(e)      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

(f)      "*Bidding Procedures*" means the procedures governing the auction and Sale Process, as approved by the Bankruptcy Court.

(g)      "*Bidding Procedures Motion*" means a motion filed by the Company Parties with the Bankruptcy Court for entry of the Bidding Procedures Order.

(h)      "*Bidding Procedures Order*" means an order (i) approving the Bidding Procedures, (ii) setting dates for the submission of bids and the auction (if any) in accordance with the Bidding Procedures, and (iii) granting related relief.

(i)      "*Claim*" has the meaning set forth in the Bankruptcy Code.

(j)      "*Chapter 11 Cases*" means the cases under chapter 11 of the Bankruptcy Code to be commenced by the Company Parties in the Bankruptcy Court.

(k)      "*Commencement Date*" means the date that the Company Parties commence the Chapter 11 Cases.

(l)      "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan.

(m)      "*Credit Agreement*" means that certain Super Senior Credit Agreement, dated August 28, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), by and among Fairway Group Acquisitions Company, as the borrower, Fairway Group Holdings Corp., the Administrative Agent, and the lenders party thereto.

2

(n)     "***Definitive Documents***" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring Transactions, including, without limitation: (i) the Sale Documents; (ii) the Plan; (iii) each of the documents comprising the Plan Supplement; (iv) the Disclosure Statement; (v) the Disclosure Statement Motion; (vi) the Disclosure Statement Order; (vii) the Confirmation Order; (viii) the motion seeking approval by the Bankruptcy Court of the DIP Facility and the DIP Orders (including any declarations or affidavits submitted in support thereof) (the "***DIP Motion***"); (ix) the interim and final orders of the Bankruptcy Court approving the DIP Motion and authorizing the use of cash collateral (the "***Interim DIP Order***" and the "***Final DIP Order***," respectively), (x) any other material, agreements, motions (including "first day" motions), pleadings, briefs, applications (other than applications to retain or compensate the Company Parties' advisors), orders and other filings made by the Company Parties with the Bankruptcy Court. Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet, and shall otherwise be reasonably acceptable to the Requisite Consenting Creditors, including with respect to any modifications, amendments, deletions, or supplements to such Definitive Documents at any time during the RSA Support Period.

(o)     "***DIP Credit Agreement***" means the credit agreement evidencing the DIP Facility on terms and conditions consistent with the DIP Term Sheet.

(p)     "***DIP Facility***" means the debtor-in-possession financing facility to be provided to the Company Parties in accordance with the terms, and subject in all respects to the terms and conditions, as set forth in the DIP Credit Agreement and the DIP Orders.

(q)     "***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

(r)     "***DIP Term Sheet***" means the term sheet setting forth the material terms of the DIP Facility attached to the Term Sheet as **Schedule 1**.

(s)     "***Disclosure Statement***" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

(t)     "***Disclosure Statement Motion***" means the motion seeking approval of the Disclosure Statement and entry of the Disclosure Statement Order.

(u)     "***Disclosure Statement Order***" means an order of the Bankruptcy Court approving the Disclosure Statement, the Plan Solicitation Materials, and the procedures for solicitation of the Plan.

(v)     "***Loans***" means any outstanding loan issued and other credit extended under the Credit Agreement.

3

(w)      "*Material Assets*" means one or more assets of the Company Parties with a fair market value equal to or greater than $250,000.

(x)      "*Person*" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(y)      "*Plan*" means a chapter 11 plan implementing the Restructuring Transactions.

(z)      "*Plan Effective Date*" means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof, as the case may be, and the Plan is substantially consummated.

(aa)      "*Plan Solicitation Materials*" means the ballots and other related materials to be distributed in connection with the solicitation of votes on the Plan.

(bb)      "*Requisite Consenting Creditors*" means, as of the date of determination, Consenting Creditors holding at least a majority in aggregate principal amount outstanding of the Loans held by all Consenting Creditors as of such date, which shall include each of both Brigade Capital Management and Special Situations Investing Group for so long as such institutions and/or their affiliates are Consenting Creditors.

(cc)      "*Restructuring Expenses*" means all reasonable and documented fees and expenses owed by the Company Parties and incurred by the Ad Hoc Group, including but not limited to the fees and expenses of King & Spalding LLP and any such other advisors engaged by the Ad Hoc Group in their reasonable discretion.

(dd)      "*Restructuring Transactions*" means all acts, events, and transactions contemplated by, required for, and taken to implement the restructuring of the Company Parties in accordance with this Agreement and the Term Sheet, including the Plan and the Sale Transactions.

(ee)      "*RSA Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of (i) the date on which this Agreement is terminated in accordance with Section 5 and (ii) the Plan Effective Date.

(ff)      "*Sale Documents*" means, collectively, (i) any asset purchase agreements and related motions, orders or other documents for or related to the Sale Transactions, (ii) the Bidding Procedures Motion and any other related motions, orders or other documents related to the Bidding Procedures (including, but not limited to, the Bidding Procedures Order) and (iii) any other motions, orders or other documents related to, or entered into by the Company Parties in connection with, the Sale Process.

(gg)      "*SEC*" means the Securities and Exchange Commission.

(hh)      "*Securities Act*" means the Securities Act of 1933, as amended.

4

(ii)      "***Stalking Horse Agreement***" means that certain asset purchase agreement by and among the Company Parties party thereto, as "Sellers" and Village Super Market, Inc., as "Buyer", for sale pursuant to section 363 of the Bankruptcy Code of the assets identified therein as the "Acquired Assets" .

(jj)      "***Support Effective Date***" means the date on which the counterpart signature pages to this Agreement have been executed and delivered by the Company Parties and Consenting Creditors holding at least 66 2/3% in aggregate principal amount outstanding of each of the L/C Facility Loans, Super Senior Secured Term Loans, Senior First Out Term Loans, Senior Last Out Term Loans and the Subordinated Loans.

## 2.      Term Sheet.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring Transactions. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between this Agreement and the Term Sheet (including the attachments thereto, as applicable), the Term Sheet (including the attachments thereto, as applicable) shall control.

## 3.      Agreements of the Consenting Creditors.

(a)      <u>Agreement to Support</u>.  During the RSA Support Period, subject to the terms and conditions hereof, each of the Consenting Creditors agrees, severally and not jointly, that it shall:

(i)      use its commercially reasonable efforts to support the Restructuring Transactions, act in good faith and take any and all reasonable actions necessary to consummate the Restructuring Transactions, in a manner consistent with this Agreement and the Term Sheet;

(ii)      refrain from initiating (or directing or encouraging the Administrative Agent or any other Person to initiate) any actions, including legal proceedings, that are inconsistent with, or that would delay, prevent, frustrate or impede the approval, confirmation or consummation, as applicable, of the Restructuring Transactions;

(iii)      not direct the Administrative Agent to take any action inconsistent with the Consenting Creditors' obligations under this Agreement, and, if the Administrative Agent takes any action inconsistent with the Consenting Creditors' obligations under this Agreement, the Consenting Creditors shall direct and use their commercially reasonable efforts to cause the Administrative Agent to cease, withdraw, and refrain from taking any such action;

(iv)      (a) timely vote (pursuant to the Plan) or cause to be voted all of its Claims (including on account of any claims other than those relating to the Credit Agreement that are owned or controlled by such Consenting Creditor) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis

5

following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and the Disclosure Statement Order and (b) to the extent such election is available, not elect on its ballot to preserve claims, if any, that such Consenting Creditor may own or control that may be affected by any releases contemplated under the Plan (and, to the extent required by such ballot, to affirmatively "opt in" to any such releases and exculpation);

(v)      negotiate in good faith with the Company Parties the forms of the Definitive Documents and execute the Definitive Documents (to the extent such Consenting Creditor is a party thereto);

(vi)     not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); *provided*, *however*, that such vote shall, without any further action by the applicable Consenting Creditor, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Creditor at any time following the expiration of the RSA Support Period;

(vii)    other than in respect of any such rights preserved under <u>Section 3(d)</u> below, not directly or indirectly, through any Person, take any action, including initiating (or encouraging any other Person to initiate) any legal proceeding, that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the consummation of the Restructuring Transactions, including the approval of the DIP Motion, the entry of the DIP Orders, the approval of the Bidding Procedures Motion, the entry of the Bidding Procedures Order, the approval of the Disclosure Statement Motion or entry of the Disclosure Statement Order, or the solicitation of votes on, and confirmation of, the Plan;

(viii)   to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(ix)     use its commercially reasonable efforts to obtain any and all required regulatory and third-party approvals for such Consenting Creditor to consummate the Restructuring Transactions and to support the Company Parties in connection with the same;

(x)      support and take all reasonable actions necessary or reasonably requested by the Company Parties to confirm such Consenting Creditors' support for the Bankruptcy Court's approval of the Plan and Disclosure Statement, the solicitation of votes on the Plan by the Company Parties, and the confirmation and consummation of the Plan and the Restructuring Transactions; and

(xi)     not challenge or support any other party that challenges the validity, enforceability, or priority of the Credit Agreement and the Claims thereunder.

6

(b)     <u>Transfers</u>.

(i)      Each Consenting Creditor agrees that, for the duration of the RSA Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges or swaps) (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims, including any beneficial ownership in any such Claims,[1] or any option thereon or any right or interest therein, unless the transferee thereof either (A) is a Consenting Creditor (with respect to a Transfer by a Consenting Creditor) or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims it already may hold against or in the Company Parties prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "***Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) Weil, Gotshal and Manges LLP ("***Weil***"), as counsel to the Company Parties and (2) King & Spalding LLP, ("***K&S***"), as counsel to the Ad Hoc Group in which event (x) the transferee shall be deemed to be a Consenting Creditor hereunder to the extent of such Transferred Claims and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of and solely with respect to such Transferred Claims (but not with respect to any other Claims or equity interests acquired or held by such transferor) (such Transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***").   Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company Parties and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(ii)     Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[2] that acquires any Claims subject to this Agreement held by a Consenting Creditor with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to become a party to this Agreement as a Consenting Creditor, if such Qualified Marketmaker Transfers such Claims (by purchase, sale, assignment, or other similar means) within the earlier of ten (10) business days of its acquisition and the plan voting deadline to a Permitted Transferee and the Transfer otherwise is a Permitted Transfer; *provided*, that a Qualified Marketmaker's failure to comply with this <u>Section 3(b)</u> shall result in the Transfer of such Claims to such Qualified Marketmaker being deemed void ab initio, and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from

---

[1] As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims subject to this Agreement or the right to acquire such Claims.

[2] As used herein, the term "***Qualified Marketmaker***" means an entity that (a) holds itself out to the public, the syndicated loan market, or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, or equity interests in, the Company Parties, or enter with customers into long and short positions in claims against the Company Parties, in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, or debt or equity securities).

7

a holder of Claims that is not a Consenting Creditor to a transferee that is not a Consenting Creditor at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(iii)    This Section 3(b) shall not impose any obligation on the Company Parties to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any Claims.  Notwithstanding anything to the contrary herein, to the extent the Company Parties and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms.

(c)    Additional Claims.  This Agreement shall in no way be construed to preclude a Consenting Creditor from acquiring additional Claims; *provided* that, to the extent any Consenting Creditor (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company Parties entitled to vote on the Plan or (iii) holds or acquires any equity interests in the Company Parties entitled to vote on the Plan, then, in each case, each such Consenting Creditor shall promptly notify Weil and K&S, and each such Consenting Creditor agrees that all such Claims and/or equity interests shall be subject to this Agreement, and agrees that, for the duration of the RSA Support Period with respect to such Consenting Creditor and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or equity interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof.  For the avoidance of doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(d)    Preservation of Rights.  Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Creditor, nor the acceptance of the Plan by any Consenting Creditor, shall:  (i) be construed to limit consent and approval rights provided in this Agreement, the Term Sheet, and the Definitive Documents; (ii) be construed to prohibit any Consenting Creditor from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (iii) limit the rights of any Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, or be construed to prohibit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in or arising in connection with the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or such Consenting Creditors' obligations hereunder and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions (and could not be reasonably expected to accomplish the same); (iv) limit the ability of any Consenting Creditor to purchase, sell, or enter into any transaction in connection with its Claims, in compliance with the terms hereof and applicable law; (v) constitute a waiver or amendment of any provision of the Credit Agreement, the Collateral Documents (as defined in the Credit Agreement) or any related documents or any other documents or agreements that give rise to a Consenting Creditor's Claims; (vi) bar any Consenting Creditor or the Administrative Agent on behalf of the

8

Consenting Creditors from filing a proof of claim with the Bankruptcy Court, or taking action to establish the amount of such claim; or (vii) limit the ability of any Consenting Creditor to assert any rights, claims, or defenses under the Credit Agreement, the Collateral Documents (as defined in the Credit Agreement), and any related documents or any other documents or agreements that give rise to a Consenting Creditor's Claims, to the extent the assertion of such rights, claims, or defenses are not inconsistent with this Agreement or such Consenting Creditors' obligations hereunder.

(e)      DIP Facility Commitment.   Each Consenting Creditor, that has executed this Agreement prior to the Petition Date (each, an "**Initial Consenting Creditor**" and collectively, the "**Initial Consenting Credit**ors") hereby commits, severally and not jointly, directly or through one more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such person), to participate in the New Money DIP Commitments and New Money Delayed Draw DIP Commitments on a pro rata basis, determined based on the outstanding aggregate principal amount of Prepetition Super Senior Loans held by the Initial Consenting Creditors or their affiliated funds as of the Support Effective Date.  In exchange for each Initial Consenting Creditor's New Money DIP Commitments and New Money Delayed Draw DIP Commitments, each Initial Consenting Creditor shall be entitled to a commitment fee equal to 4.00% on the entire New Money DIP Commitments and the New Money Delayed Draw DIP Commitments (solely to the extent funded) as further set forth in the DIP Term Sheet attached as Schedule 1 to the Term Sheet.

(f)      Stock Transfer Restriction and Tax Attribute Protection Motions. Each Consenting Creditor, severally and not jointly, agrees not to transfer any equity interests in Fairway prior to the Commencement Date in a manner that would change the ownership of such equity interests for purposes of section 382 of title 26 of the United States Code (the "Tax Code") without the prior consent of the Company not to be unreasonably withheld, conditioned, or delayed. Each Consenting Creditor further agrees to support the filing of a customary stock trading order that restricts the accumulation and disposition of equity interests in Fairway by persons who own, or would own, more than approximately 4.75% of the equity interests during the pendency of the Chapter 11 Cases.

## 4.      Agreements of the Company Parties.

(a)      Covenants.  Each Company Party agrees that, for the duration of the RSA Support Period, such Company Party shall:

(i)      (A) support and use commercially reasonable efforts to consummate and complete the Restructuring Transactions, and all transactions contemplated under this Agreement (including, without limitation, those described in the Term Sheet), and take any and all reasonably necessary actions in furtherance thereof, including, without limitation, (1) complete and file, within the timeframes contemplated herein, the Sale Documents, the Plan, the Disclosure Statement, and the other Definitive Documents, (2) use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving the DIP Credit Agreement, the DIP Orders, the Sale Documents (to the extent requiring approval of the

9

Bankruptcy Court), the Disclosure Statement, and confirming the Plan, and any other Definitive Document requiring the approval of the Bankruptcy Court within the timeframes contemplated by this Agreement (or, if this Agreement is silent, as soon as reasonably practicable); and (3) prosecute and defend any objections or appeals relating to the DIP Orders, any orders approving the Sale Documents, the Disclosure Statement Order, the Confirmation Order, and/or the Restructuring Transactions or any Definitive Document filed or entered into by a Company Party in connection therewith; and (B) not take any action that is inconsistent with, or to alter, delay, impede, or interfere with, approval of the DIP Motion, the Sale Documents, the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the Restructuring Transactions or any Definitive Document filed or entered into by a Company Party;

(ii)    not seek, solicit, propose, or support an Alternative Transaction; *provided*, *however*, that if the Company Parties receive an unsolicited bona fide proposal or expression of interest in undertaking an Alternative Transaction that the boards of directors, members, or managers (as applicable) of the Company Parties, determine in their good-faith judgment provides a higher or better economic recovery to the Company Parties' stakeholders than that set forth in this Agreement, and such Alternative Transaction is from a proponent that the boards of directors, members, or managers (as applicable) of the Company Parties have reasonably determined is capable of timely consummating such Alternative Transaction, the Company Parties will, within 48 hours of the receipt of such proposals or expression of interest, notify the Consenting Creditors in accordance with Section 20 hereof (or solely to K&S to the extent notice of the bona fide proposal or expression of interest must remain confidential; provided that the Company Parties shall notify the Consenting Creditors in accordance with Section 20 as soon as reasonably practicable) of the receipt thereof, with such notice to include the materials terms thereof, including the identity of the Person or Persons involved;

(iii)   on or before the Commencement Date, provide draft copies of "first day" motions and orders, including a first day declaration, the motion seeking approval of the DIP Facility, the Bidding Procedures Motion, and the Bidding Procedures Order, in each case, in form and substance reasonably acceptable to the Requisite Consenting Creditors;

(iv)    provide draft copies of all material motions or applications and other documents (including the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the Confirmation Order) that the Company Parties intend to file with the Bankruptcy Court to K&S, if reasonably practical, at least three (3) business days prior to the date when the Company Parties intend to file any such pleading or other document  (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement, the Confirmation Order or an adequate protection order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

10

(v)     file the "first day" motions reasonably determined by the Company Parties, in form and substance reasonably acceptable to the Requisite Consenting Creditors, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Company Parties and the Requisite Consenting Creditors, from the Bankruptcy Court approving the relief requested in the first day" motions;

(vi)     not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring Transactions;

(vii)     subject to appropriate confidentiality arrangements, provide to the Consenting Creditors' professionals, upon reasonable advance notice to the Company Parties: (A) reasonable access (without any material disruption to the conduct of the Company Parties' business) during normal business hours to the Company Parties' books, records, and facilities; (B) reasonable access to the respective management and advisors of the Company Parties for the purposes of evaluating the Company Parties' finances and operations and participating in the planning process with respect to the Restructuring Transactions; (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any debtor-in-possession and/or exit financing); and (D) prompt and reasonable responses to all reasonable diligence requests;

(viii)     use their commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring;

(ix)     promptly pay all Restructuring Expenses in accordance with Section 16 of this Agreement;

(x)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(xi)     not enter into any commitment or agreement with respect to debtor-in-possession financing, use of cash collateral, adequate protection, exit financing, and/or any other financing arrangements other than the DIP Facility unless otherwise agreed to by the Company Parties, and the Requisite Consenting Lenders, other than such financing arrangements that arise in the ordinary course of the Company Parties' business operations;

(xii)     not sell any Material Assets outside of the ordinary course of business other than in connection with the Sale Transactions contemplated by the Bidding Procedures Motion without the prior written consent (including e-mail) of the Requisite Consenting Creditors;

(xiii)     subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring Transactions, preserve intact in all

11

material respects the current business operations of the Company Parties (other than as consistent with applicable fiduciary duties), keep available the services of its current officers and material employees (in each case, other than as contemplated by the Company Parties' current business plan provided to the Consenting Creditors, voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, in each case, having material business dealings with the Company Parties (other than terminations for cause or consistent with applicable fiduciary duties);

(xiv)    not commence or support any avoidance action or other legal proceeding (or consent to any other Person obtaining standing to commence any such avoidance action or other legal proceeding) that challenges the validity, enforceability, or priority of the Credit Agreement;

(xv)    provide prompt written notice (in accordance with <u>Section 20</u> hereof) to the Consenting Creditors and K&S between the date hereof and the Plan Effective Date of (A)  receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions; (B)  receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring Transactions; and (C) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company Parties, threatened against the Company Parties, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions.

(b)    <u>Automatic Stay</u>.    The Company Parties acknowledge and agree and shall not dispute the after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company Parties hereby waive, to the greatest extent legally possible, the applicability of the automatic stay to the giving of such notice); *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

## 5.    Termination of Agreement.

(a)    This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with <u>Section 20</u> hereof, from, as applicable, (x) the Requisite Consenting Creditors at any time after and during the continuance of any Lender Termination Event (as defined herein); or (y) Company Parties at any time after and during the continuance of any Company Termination Event, as applicable.  Notwithstanding any provision to the contrary in this <u>Section 5</u>, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of a Lender

12

Termination Event  or Company Termination Event (as defined herein) specified herein. This Agreement shall terminate on the Plan Effective Date without any further required action or notice.

(b)      A "**_Lender Termination Event_**" shall mean any of the following:

(i)      the breach by any Company Party of (a) any covenant contained in this Agreement or (b) any other obligations of the Company Parties set forth in this Agreement, and, in each case, in any material respect and, in either respect, such breach remains uncured (solely to the extent capable of being cured) for a period of five (5) business days following the Company Parties' receipt of written notice pursuant to Sections 5(a) and 20 hereof (as applicable);

(ii)      any representation or warranty in this Agreement made by a Company Party shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of  five (5) business days following the Company's receipt of notice pursuant to Sections 5(a) and 20 hereof (as applicable);

(iii)      the Definitive Documents and any amendments, modifications, or supplements thereto filed or entered into by the Company Parties include terms that are materially inconsistent with the Term Sheet and are not otherwise reasonably acceptable to the Requisite Consenting Creditors, and such event remains unremedied for a period of five (5) calendar days following the Company Parties' receipt of notice pursuant to Sections 5(a) and Section 20 hereto (as applicable);

(iv)      a Definitive Document alters the treatment of the Lenders specified in the Term Sheet without complying with Section 9 hereof and the Requisite Consenting Creditors have not otherwise consented to such Definitive Document;

(v)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order declaring this Agreement to be unenforceable, enjoining the consummation of the Restructuring Transactions or rendering illegal this Agreement, the Plan or the Restructuring Transactions, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of a Company Party,  or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(vi)      the Support Effective Date shall not have occurred on or before the Commencement Date;

(vii)      the Company Parties shall not have complied with Milestones set out in the Term Sheet;

(viii)      the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of a trustee or examiner with expanded powers to operate the Company

13

Parties' business in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein or (E) granting relief that is inconsistent with this Agreement or the Plan in any materially adverse respect to the Consenting Creditors, in each case;

(ix)     the Confirmation Order is reversed or vacated by a final order;

(x)     if either (A) any Company Party (or any person or entity on behalf of any Company Party or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (1) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of any of the obligations or Claims under the Credit Agreement, or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Lenders with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Credit Agreement;

(xi)     the DIP Facility is not approved by the Bankruptcy Court or is terminated in accordance with the terms of the DIP Credit Agreement and the DIP Orders;

(xii)     the Company Parties' use of cash collateral has been terminated in accordance with the terms of the DIP Orders;

(xiii)     any Company Party files or seeks approval of, or supports (or fails to timely object to) another party in, filing or seeking approval of an Alternative Transaction;

(xiv)     the commencement of an involuntary bankruptcy case against any Company Party under the Bankruptcy Code, if such involuntary case is not dismissed within twenty (20) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(xv)     if any Company Party (A) withdraws the Plan, (B) publicly announces its intention not to support the Restructuring Transactions or the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue an Alternative Transaction;

(xvi)     the Bankruptcy Court enters an order modifying or terminating the Company Parties' exclusive right to file and solicit acceptances of a plan of reorganization (including the Plan);

14

(xvii)   the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any Material Asset of a Company Party in a manner that materially impacts Restructuring Transactions without the prior written consent of the Requisite Consenting Creditors;

(xviii)  the termination of the Stalking Horse Agreement or the asset purchase agreement(s) entered into in connection with the Sale Process (if not the Stalking Horse Agreement) without entry into a new purchase agreement reasonably acceptable to the Consenting Creditors within five (5) business days; or

(xix)    the Bankruptcy Court enters a final order disallowing, invalidating, subordinating, recharacterizing, or declaring unenforceable the claims, liens or interests, in any material respect, held by any Consenting Creditor or the Administrative Agent arising under the Credit Agreement.

(c)      A "*Company Termination Event*" shall mean any of the following:

(i)      the breach in any material respect by one or more of the Consenting Creditors, of any of the undertakings, representations, warranties, or covenants of the Consenting Creditors set forth herein in any material respect that remains uncured (solely to the extent capable of being cured) for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 5(a) and 20 hereof (as applicable), *provided*, that this Agreement is still binding on other Consenting Creditors if they hold more than 66 2/3% of the Senior First Out Term Loans;

(ii)     the board of directors, members, or managers (as applicable) of any Company Party reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement or pursuit of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided*, that the Company Parties shall provide notice of such determination to K&S via email within one (1) business day after the date thereof; *provided further* that the Consenting Creditors reserve all rights they may have to challenge the exercise by the Company Parties of their ability to terminate this Agreement pursuant to this Section 5(c)(ii);

(iii)    the Company Parties shall not have obtained votes accepting the Plan from holders of the Loans sufficient to satisfy the conditions for acceptable set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(iv)     the Support Effective Date shall not have occurred on or before the Commencement Date;

(v)      if the Plan Effective Date shall not have occurred on before 125 days following the Commencement Date; or

15

(vi)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order declaring this Agreement unenforceable, enjoining the consummation of a material portion of the Restructuring Transactions or rendering illegal this Agreement, the Plan or the Restructuring Transactions, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance.

(d)     <u>Mutual Termination</u>.  This Agreement may be terminated by mutual agreement of the Company Parties and the Requisite Consenting Creditors upon the receipt of written notice delivered in accordance with <u>Section 20</u> hereof.

(e)     <u>Automatic Termination</u>.  This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Plan Effective Date.

(f)     <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u> if the Restructuring Transactions have not been consummated, and except as provided in <u>Section 13</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; *provided*, *however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, each vote or any consents given by any Consenting Creditor prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement, in each case, without further confirmation or other action by such Consenting Creditor.  If this Agreement has been terminated in accordance with <u>Section 5(a)</u> , the Company Parties shall not oppose any attempt by a Consenting Creditor to change or withdraw (or cause to change or withdraw) its vote to accept the Plan.  Such Consenting Creditor shall have no liability to the Company Parties or to any other Consenting Creditor in respect of any termination of this Agreement in accordance with the terms of this <u>Section 5</u> and <u>Section 21</u> hereof.

(g)     If the Restructuring Transactions have not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

16

6. **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Subject to the terms and conditions described herein, during the RSA Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring Transactions, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents. Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; *provided* that no Consenting Creditor shall be required to incur any material cost, expense, or liability in connection therewith.

7. **Representations and Warranties.**

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Creditor that becomes a party hereto after the date hereof, as of the date such Consenting Creditor becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party other than any default caused by the commencement of the Chapter 11 Cases or as contemplated by the Restructuring Transactions;

(iii)     the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary or required by the SEC; and

(iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or

17

limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Creditor severally (and not jointly), represents and warrants to the Company Parties that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of, or investment advisor or manager of funds that are beneficial owners of, the aggregate principal amount of Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own, or manager or advisor funds  that own, any other Loans and (ii) has, with respect to the beneficial owners of such Loans, (A) sole investment or voting discretion with respect to such Loans, (B) full power and authority to vote on and consent to matters concerning such Loans or to exchange, assign and transfer such Loans, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each Consenting Creditor severally and not jointly makes the representations and warranties set forth in this <u>Section 7</u>, in each case, to the other Parties.

## 8.    Disclosure; Publicity.

(a)    Each Company Party shall submit drafts to the Consenting Creditors and their advisors in accordance with <u>Section 20</u> of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) calendar day before making any such disclosure, and any such press releases, and other public documents, shall be reasonably acceptable in all material respects to the Requisite Consenting Creditors.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company Parties and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company Parties and the Consenting Creditors, the principal amount of the Loans held by the Consenting Creditor, without such Consenting Creditor's prior written consent; *provided*, <u>however</u>, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Loans held by all the Consenting Creditors collectively.

## 9.    Amendments and Waivers.

This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company Parties and the Requisite Consenting Creditors; *provided*, *however*, that any waiver, modification, amendment or supplement to this <u>Section 9</u> shall require the written consent of all of the Parties; *provided*, *further*,

18

that any modification, amendment or change to the definition of Requisite Consenting Creditors shall require the written consent of each Consenting Creditor; *provided*, *further*, that any change, waiver, modification or amendment to this Agreement or the Term Sheet that treats or affects any Consenting Creditor in a manner that is disproportionately and adverse, on an economic or non-economic basis, in a material respect, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditor's respective Claims, the relative priorities of such Claims set forth in the Credit Agreement, and the recoveries contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor.  In the event that an adversely affected Consenting Creditor does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor (such lender, a "***Non-Consenting Creditor***"), but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least 66 2/3% of the aggregate outstanding principal amount of the Senior First Out Term Loans, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors who have so consented, in a way consistent with this Agreement and the Term Sheet as waived, changed, modified, or amended, as applicable.

## 10.    Effectiveness.

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; *provided* that signature pages executed by Consenting Creditors shall be delivered to (a) the other Consenting Creditors in a redacted form that removes such Consenting Creditors' holdings of the Loans or any other Claims against or interests in the Company Parties and any schedules to such Consenting Creditors' holdings (if applicable) and (b) the Company Parties, Weil, and K&S in an unredacted form (and to be kept confidential by the Company Parties, Weil, and K&S).

## 11.    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in the Borough of Manhattan in the State of New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive

19

any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 11(b)</u> shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### 12.    Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

### 13.    Survival.

Notwithstanding the termination of this Agreement pursuant to <u>Section 5</u> hereof, the agreements and obligations of the Parties in this <u>Section 13</u>, and <u>Sections 4(b)</u>, <u>5(g)</u>, 10 (with respect to the redacted information), <u>11</u>, <u>12</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u> (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

WEIL:\97352158\1\44444.0008

### 14.    Headings.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

### 15.    Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that nothing contained in this Section 20 shall be deemed to permit Transfers of the Loans or claims arising under the Loans other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

### 16.    Restructuring Expenses.

Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree to pay, in cash, all Restructuring Expenses as follows: (i) all accrued and unpaid Restructuring Expenses shall be paid in full in cash on or prior to the Support  Effective Date, (ii) prior to the Petition Date and after the Support Effective Date, all Restructuring Expenses incurred during such period (and not previously paid pursuant to the preceding clause (i), if any) shall be paid in full in cash by the Company Parties on a regular and continuing basis as soon as reasonably practicable, and in any event, prior to the Petition Date, and (iii) after the Petition Date and during the RSA Support Period, all accrued and unpaid Restructuring Expenses incurred up to (and including) the Plan Effective Date (including all accrued and unpaid fees and expenses incurred through the Support Effective Date) shall be paid in full in cash on the Plan Effective Date (provided, for the avoidance of doubt, that such Restructuring Expenses have not been satisfied during the Chapter 11 Cases pursuant to the DIP Orders), without any requirement for Bankruptcy Court review or further Bankruptcy Court order.  Notwithstanding the foregoing, nothing herein shall affect or limit any obligations of the Company Parties to pay the Restructuring Expenses as provided in the DIP Orders.

### 17.    No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

21

### 18.    Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company Parties and each Consenting Creditor shall continue in full force and effect.

### 19.    Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

### 20.    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, by overnight courier or by registered or certified mail (return receipt requested) to the following addresses:

(a)    If to the Company Parties, to:

> c/o Fairway Group Holdings Corp.
> 2284 12th Avenue
> New York, NY 10027
> Attention:    Nathalie Augustin
> Facsimile:    (646) 616-8000
> E-mail:    nathalie.augustin@fairwaymarket.com

with a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attention:    Ray C. Schrock, P.C., Sunny Singh, Esq. and Paloma Van Groll, Esq.
> E-mail:    ray.schrock@weil.com, sunny.singh@weil.com and Paloma.vangroll@weil.com

(b)    if to a Consenting Creditor or a transferee thereof, to the addresses or e-mail addresses set forth below such Consenting Creditor's signature hereto (or as directed by any transferee thereof), as the case may be, with a copy (which shall not constitute notice) to:

> King & Spalding LLP
> 1185 Avenue of the Americas
> New York, NY 10036

22

|  |  |
|---|---|
| Attention: | W. Austin Jowers, Esq. and Michael R. Handler, Esq. |
| Email: | ajowers@kslaw.com and mhandler@kslaw.com |

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon transmission.

### 21.    Reservation of Rights; No Admission.

(a)      Nothing contained herein shall limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder.

(b)      Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company Parties.  This Agreement and the Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 22.    Relationship Among Consenting Creditors.

It is understood and agreed that no Consenting Creditor has any duty of trust or confidence of any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them.  No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditor shall in any way affect or negate this understanding and agreement.

### 23.    No Solicitation; Representation by Counsel; Adequate Information.

(a)      This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Consenting Creditors or a solicitation to tender or exchange any of the Loans.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

23

(b)      Each Party acknowledges that it has had an opportunity to receive information from the Company Parties and that it has been, or is part of a group that has been, represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)      Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is an accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act) and a qualified institutional buyer as such term is defined in Rule 144A of the Securities Act, (ii) understands that the securities to be acquired by it (if any) pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment.

*[Remainder of Page Intentionally Left Blank]*

24

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**Fairway Group Holdings Corp.**
on its own behalf and on behalf of its direct and indirect subsidiaries

By: _____

Name: Abel Porter

Title: CEO

SPECIAL SITUATIONS INVESTING GROUP, INC., as a Consenting Creditor

By: _____

Name: _____

Title: _Authorized Signatory_

Principal Amount of the L/C Facility Loans: $ 9,936,853.57
Principal Amount of the Super Senior Secured Term Loans: $ 5,950,211.86
Principal Amount of the Senior First Out Term Loans: $ 12,312,820.43
Principal Amount of the Senior Last Out Term Loans: $ 9,294,056.21
Principal Amount of the Subordinated Loans: $ 8,338,052.87

Notice Address:

200 West Street
New York, NY 10282
_____

Fax: _____
Attention: Vincent Harrison
E-mail: vincent.harrison@gs.com

SPECIAL SITUATIONS INVESTING GROUP II,
LLC, as a Consenting Creditor

By: _____    *s/c*

Name:

Title:    *Authorized Signatory*

Principal Amount of the L/C Facility Loans: $ 0

Principal Amount of the Super Senior Secured Term Loans: $ 0

Principal Amount of the Senior First Out Term Loans: $ 19,413,549.75

Principal Amount of the Senior Last Out Term Loans: $ 15,209,275.74

Principal Amount of the Subordinated Loans: $ 13,644,822.24

Notice Address:

200 West Street

New York, NY 10282

_____

Fax: _____

Attention: Vincent Harrison

E-mail: vincent.harrison@gs.com

[Signature Page to Restructuring Support Agreement]

FS KKR CAPITAL CORP. II, as a Consenting Creditor

By: _____

Name: Jessica Woolf
Title: Authorized signatory

Principal Amount of the L/C Facility Loans: $ 3,974,632.71
Principal Amount of the Super Senior Secured Term Loans: $ 2,380,019.64
Principal Amount of the Senior First Out Term Loans: $ 11,300,244.80
Principal Amount of the Senior Last Out Term Loans: $ 7,080,730.45
Principal Amount of the Subordinated Loans: $ 6,352,393.80

Notice Address:

KKR Credit Advisors (US) LLC
555 California Street, 50th Floor
San Francisco, CA 94104
Fax: _____
Attention: Rony Ma & General Counsel
E-mail: Rony.Ma@kkr.com & KKRCreditLegal@kkr.com

[Signature Page to Restructuring Support Agreement]

FS GLOBAL CREDIT OPPORTUNITIES FUND, as a
Consenting Creditor

By:  FS Global Advisor, LLC, its investment advisor

By: _____

Name: Edward T. Gallivan, Jr.
Title: Chief Financial Officer


Principal Amount of the L/C Facility Loans: $    2,950,078.59
Principal Amount of the Super Senior Secured Term Loans: $    1766 514.17
Principal Amount of the Senior First Out Term Loans: $    8 387,343.67
Principal Amount of the Senior Last Out Term Loans: $    5,255,507.36
Principal Amount of the Subordinated Loans: $        4 , 714 , 916.43

Notice Address:

201 Rouse Boulevard
Philadelphia, PA 19112

Fax: 1-469-518-3824
Attention: FS Investment Operations
E-mail: Investmentops@fsinvestments.com

[Signature Page to Restructuring Support Agreement]

BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager on Behalf of its Various Funds
& Accounts, as Consenting Creditors

By: _____

Name: Patrick Criscillo
Title: Chief Financial Officer

Principal Amount of the L/C Facility Loans: $9,936,853.58
Principal Amount of the Super Senior Secured Term Loans: $5,950,211.87
Principal Amount of the Senior First Out Term Loans: $24,788,295.90
Principal Amount of the Senior Last Out Term Loans: $10,908,743.22
Principal Amount of the Subordinated Loans: $9,786,650.37

Notice Address:

399 Park Avenue
16th Floor
New York, NY, 10022
Fax: (212) 547-4623
Attention: Jeff Frusciante
E-mail: operations@brigadecapital.com

Consenting Creditors of:

Super Senior Secured Term Loans:
Brigade Leveraged Capital Structures Fund Ltd.
Panther BCM LLC

L/C Facility Loan:
Brigade Leveraged Capital Structures Fund Ltd.
Panther BCM LLC

Subordinated Loans:
Blue Falcon Limited
BATTALION CLO IV LTD
BATTALION CLO V LTD.
BATTALION CLO VI LTD.
BATTALION CLO VII LTD.
BATTALION CLO VIII LTD.
BATTALION CLO IX LTD.
Brigade Distressed Value Master Fund Ltd.
JPMorgan Chase Retirement Plan Brigade Bank Loan
Brigade Leveraged Capital Structures Fund Ltd.
Panther BCM LLC

Senior First Out Term Loans:
Brigade Credit Fund II Ltd.
Brigade Leveraged Capital Structures Fund Ltd.
Panther BCM LLC

Senior Last Out Term Loans:
Blue Falcon Limited
BATTALION CLO IV LTD
BATTALION CLO V LTD.
BATTALION CLO VI LTD.
BATTALION CLO VII LTD.
BATTALION CLO VIII LTD.
BATTALION CLO IX LTD.
Brigade Distressed Value Master Fund Ltd.
JPMorgan Chase Retirement Plan Brigade Bank Loan
Brigade Leveraged Capital Structures Fund Ltd.
Panther BCM LLC

[Signature Page to Restructuring Support Agreement]

## <u>Exhibit A</u>

**Restructuring Term Sheet**

Execution Version

## EXHIBIT A

### FAIRWAY GROUP HOLDINGS CORP.
### RESTRUCTURING TERM SHEET

This term sheet (this "***Term Sheet***")[1] sets forth the principal terms of a restructuring of the Company (the "***Restructuring***" or "***Restructuring Transactions***") to be implemented in cases commenced by the Company under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").

This Term Sheet is attached as **Exhibit A** to the Restructuring Support Agreement dated January 22, 2020, by and among the Company and the Consenting Creditors (the "***RSA***"). The Restructuring is supported by the Company and the Consenting Creditors, which Consenting Creditors consist of certain Prepetition Lenders under the Prepetition Credit Agreement and those Prepetition Lenders who are or become party to the RSA.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION OR LIQUIDATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, MAY ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF FCI AND THE REQUISITE CREDITORS, EXCEPT AS REQUIRED BY LAW AND AS CONTEMPLATED BY THE RSA.

| Company Overview | |
|---|---|
| **Overview** | This Term Sheet summarizes the terms of the Restructuring of the Company to be effectuated through a prearranged chapter 11 filing providing for (i) the sale of certain of the Company's core assets under section 363 of the Bankruptcy Code pursuant to the Stalking Horse Agreement (subject to higher or better offers as set forth in Bidding Procedures) (together with any other sale or sales of the Company's assets pursuant to section 363 of the Bankruptcy Code, each, a "***Sale Transaction***"; and collectively, the "***Sale Transactions***") and (ii) a chapter 11 plan (the "***Plan***"). |
| **Company:** | Fairway Group Holdings Corp. ("***Fairway***") and its direct and indirect subsidiaries Fairway Group Acquisition Company; Fairway Bakery LLC; Fairway Broadway LLC; Fairway Chelsea LLC; Fairway Construction Group, LLC; Fairway Douglaston LLC; Fairway East 86th Street LLC; Fairway eCommerce LLC; Fairway Georgetowne LLC; Fairway Greenwich Street LLC; Fairway Group Central Services LLC; Fairway Group Plainview LLC; Fairway Hudson Yards LLC; Fairway Kips Bay LLC; FN Store LLC; Fairway Paramus LLC; Fairway Pelham LLC; Fairway Pelham Wines & Spirits LLC; Fairway Red Hook LLC; Fairway Stamford LLC; Fairway Stamford Wines & Spirits LLC; Fairway Staten Island LLC; Fairway Uptown LLC; Fairway Westbury LLC; and Fairway Woodland Park LLC (such entities, together with Fairway, collectively referred to as the "***Debtors***" or the "***Company***"). |

---

[1] Capitalized terms used but not defined herein have the meanings assigned to them in the RSA (as defined below). To the extent of any direct conflict between this Term Sheet and the RSA, the RSA will govern and control.

| | |
|---|---|
| **Claims and Interests to be Restructured:** | <u>Super Senior Secured Term Loan Claims</u>:  Claims on account of the super senior secured delayed draw first out term loans (such facility, the "***Super Senior Secured New Term Loan Facility***"; the loans thereunder, the "***Super Senior Secured New Term Loans***," and such claims, the "***Super Senior Secured New Term Loan Claims***") under that certain Super Senior Credit Agreement, dated as of August 28, 2018 (as amended by that Waiver and First Amendment, dated as of November 18, 2016, that Waiver and Second Amendment, dated as of June 28, 2017, that Third Amendment, dated as of September 18, 2017 and that Fourth Amendment, dated as of the date hereof, and as modified by those letter agreements with respect to the extension of the annual audit delivery deadline dated as of July 28, 2017, August 31, 2017 and July 27, 2018, and as may be further amended, supplemented, or modified from time to time, the "***Prepetition Credit Agreement***"), among Fairway, Fairway Group Acquisition Company, the lenders party thereto (each, a "***Prepetition Lender***"), and Ankura Trust Company, LLC, as administrative agent and collateral agent for the Prepetition Lenders (the "***Prepetition Agent***").

<u>Super Senior Secured L/C Facility Claims</u>:  Claims on account of the super senior secured credit facility (such facility, the "***Super Senior Secured L/C Facility***"; the loans thereunder, the "***Super Senior Secured L/C Facility Loans***"; and together with the Super Senior Secured New Term Loans, the "***Super Senior Secured Term Loans***"; and such claims, the "***Super Senior Secured L/C Facility Claims***," and together with the Super Senior Secured New Term Loan Claims, the "***Super Senior Secured Claims***") under the Prepetition Credit Agreement.

<u>Senior First Out Term Loan Claims</u>:  Claims on account of the secured first out term loans (such term loans, the "***Senior First Out Term Loans***"; and such claims, the "***Senior First Out Term Loan Claims***") under the Prepetition Credit Agreement.

<u>Senior Last Out Term Loan Claims</u>:  Claims on account of the secured last out term loans (such term loans, the "***Senior Last Out Term Loans***"; and together with the Super Senior Secured Term Loans, the "***OpCo Term Loans***,"; and such claims, the "***Senior Last Out Term Loan Claims***," and together with the Super Senior Secured Claims, the "***OpCo Term Loan Claims***") under the Prepetition Credit Agreement.

<u>Holdco Loan Claims</u>:  Claims on account of the secured subordinated term loans (such term loans, the "***Holdco Loans***," and together with the OpCo Term Loans, the "***Prepetition Loans***"; and such claims, the "***Holdco Loan Claims***"; and together with the OpCo Term Loan Claims, the "***Prepetition Loan Claims***") under the Prepetition Credit Agreement.

<u>General Unsecured Claims</u>: Consisting of any Claim against the Debtors (other than any Intercompany Claims) as of the Commencement Date that is neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court (the "***General Unsecured Claims***").  The General Unsecured Claims shall not include the Prepetition Loan Claims (but shall include any unsecured deficiency claims).

<u>Interests</u>: Consisting of any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all ordinary shares, common stock, preferred stock, membership interest, partnership interest or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any restricted share, option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the effective date of the Plan (the "***Plan Effective Date***"). (the "***Interests***"). |
| **Transaction Overview** | |
| **Implementation:** | The Company will commence the Chapter 11 Cases and implement the Restructuring Transaction pursuant to the Plan as provided in the RSA.  The transactions in this Term Sheet may be effectuated as: |

WEIL:\97352223\1\44444.0008

|  | (a) one or more Sale Transactions followed by a chapter 11 plan to distribute proceeds thereof; and/or |
|  | (b) such other transactions acceptable to the Company and the Requisite Consenting Creditors, in their sole discretion. |
| **Sale Process**: | Following the Commencement Date, the Company shall oversee and manage a comprehensive sale and marketing process to solicit bids in accordance with the Bidding Procedures in good-faith consultation with the Requisite Consenting Creditors (the "*Sale Process*"). |
|  | The Sale Process shall be conducted in accordance with the procedures and timeline set forth in the Bidding Procedures, subject to approval of the Bankruptcy Court. The Consenting Creditors and their advisors shall have the right to review all information, diligence, and materials provided by the Company or its advisors to any bidder or prospective bidder with respect to the sale and to consult with the Company and its advisors with respect to any potential Sale Transaction. |
| **Plan Process**: | The plan solicitation process shall generally be conducted in accordance with the Milestones (as defined herein) and the procedures and timeline set forth in the order approving the Disclosure Statement, subject to approval of the Bankruptcy Court. |
|  | In the event that the Debtors close a Sale Transaction, the Debtors shall distribute the proceeds of such Sale Transaction, if any, and the Debtors' remaining assets to holders of allowed claims and interests pursuant to the Plan (subject to the mandatory prepayment requirements set forth in the DIP Credit Agreement). |
| **Credit Bid:** | The Requisite Consenting Creditors may direct the Prepetition Agent to "credit bid" the Prepetition Loans (subject to satisfaction in full of senior indebtedness) to purchase the Company's assets pursuant to section 363(k) of the Bankruptcy Code. |
| **DIP Facility:** | Certain of the Consenting Creditors shall provide the Company with a secured debtor-in-possession financing as set forth in a debtor-in-possession financing agreement (the "***DIP Credit Agreement***"), the proceeds of which shall be used for, among other things, general corporate purposes during the pendency of the Chapter 11 Cases and to conduct the Sale Process on the terms and conditions consistent with those set forth in the DIP Term Sheet attached hereto as **Schedule 1** (the "***DIP Facility***"). |
| **Use of Cash Collateral:** | The Debtors will seek authority promptly upon commencement of the Chapter 11 Cases to use cash collateral of the Prepetition Lenders to help fund the administration of the Chapter 11 Cases. In connection with the Debtors' use of cash collateral and DIP Facility, subject to Bankruptcy Court approval, the Company will agree to provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the Consenting Creditors as set forth in the DIP Term Sheet and the DIP Orders, in exchange for the Consenting Creditors' consent to use cash collateral. |
| **Milestones** | The Consenting Creditors' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "***Milestones***"), which may be extended with the prior written consent of the Requisite Consenting Creditors: |
|  | • As of 11:59 p.m. prevailing Eastern Time on the date that is 2 days from the Commencement Date, the Debtors have filed the Bidding Procedures Motion; |

WEIL:\97352223\1\44444.0008

- As of 11:59 p.m. prevailing Eastern Time on the date that is 3 days from the Commencement Date, the Interim DIP Order has been entered by the Bankruptcy Court;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 25 days following the filing of the Bidding Procedures Motion, the Bidding Procedures Order has been entered by the Bankruptcy Court;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 30 days from the Commencement Date, the Debtors have filed the Disclosure Statement and the Plan;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 35 days from the Commencement Date, the Final DIP Order has been entered by the Bankruptcy Court;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 50 days from the Commencement Date, the Debtors have commenced the Auction, if applicable, for the Stalking Horse Package (as such terms are defined in the Bidding Procedures);

- As of 11:59 p.m. prevailing Eastern Time on the date that is 55 days from the Commencement Date, the Debtors have commenced the Auction, if applicable, for the Other Assets (as such term is defined in the Bidding Procedures);

- As of 11:59 p.m. prevailing Eastern Time on the date that is 65 days from the Commencement Date, the Sale Order has been entered by the Bankruptcy Court approving the sale of the Stalking Horse Package, provided that if there is no overbid for the Stalking Horse Package, then then the Sale Order shall be entered no later than 50 days from the Commencement Date;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 68 days from the Commencement Date, the Debtors shall have consummated the sale(s) of Stalking Horse Package to the winning bidder(s) at the Auction, provided that if there is no overbid for the Stalking Horse Package, then then the Debtors shall have consummated the sale(s) of the Stalking Horse Package no later than 55 days from the Commencement Date;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 65 days from the Commencement Date, the Sale Order has been entered by the Bankruptcy Court approving the sale of the Other Assets;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 65 days from the Commencement Date, the Bankruptcy Court has entered the Disclosure Statement Order;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 70 days from the Commencement Date, the Debtors shall have consummated the sale(s) of the Other Assets to the winning bidder(s) at the Auction;

WEIL:\97352223\1\44444.0008

|  | • As of the 11:59 p.m. prevailing Eastern Time on the date that is 120 days from the Commencement Date, the Bankruptcy Court has entered the Confirmation Order; and |
|  | • As of the 11:59 p.m. prevailing Eastern Time on the date that is 125 days from the Commencement Date, the Plan Effective Date has occurred. |

| **Classification and Treatment of Claims and Interests Under the Plan** | |
| --- | --- |
| **DIP Claims:** | The claims arising under the DIP Credit Agreement (the "**DIP Claims**") shall be allowed in full.<br><br>All outstanding DIP Claims shall be paid in full in cash upon the Plan Effective Date. |
| **Administrative, Priority Tax, Other Priority, and Other Secured Claims:** | On or as soon as practicable after the Plan Effective Date, each holder of an administrative, priority tax or other priority claim, or any other secured claim (other than secured claims under the Prepetition Credit Agreement) will be paid in full from available cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. The allowed amounts and payment terms of 503(b)(9) claims shall each be satisfactory to Requisite Consenting Creditors as a condition to the occurrence of the Plan Effective Date.<br><br>*Unimpaired – Deemed to Accept* |
| **Super Senior Secured Claims** | Super Senior Secured Claims shall be allowed in the outstanding principal amount of $[•] minus any portion of such claims "rolled-up" in connection with the DIP Facility, plus all accrued interest, costs, fees, and expenses under the Prepetition Credit Agreement.<br><br>On the Plan Effective Date, or as soon as reasonably practicable after each distribution date, the holders of outstanding allowed Super Senior Secured Claims will receive their *pro rata* share of the sum of the amount of cash available for distribution to holders of Super Senior Secured Claims, after the payment in full in cash (or establishment of reserves to satisfy) of administrative claims, priority tax or other priority claims, and other secured claims.<br><br>*Impaired – Entitled to Vote* |
| **Senior First Out Term Loan Claims** | Senior First Out Term Loan Claims shall be allowed in the outstanding principal amount of $[•] minus any portion of such claims "rolled-up" in connection with the DIP Facility, plus all accrued interest, costs, fees, and expenses under the Prepetition Credit Agreement.<br><br>On the Plan Effective Date, or as soon as reasonably practicable after each distribution date, holders of allowed Senior First Out Term Loan Claims will receive their *pro rata* share of the sum of the amount of cash available for distribution to holders of allowed Senior First Out Term Loan Claims, after payment in full in cash of all senior claims. In the event that allowed Super Senior Secured Claims are not satisfied in full under the Plan, holders of allowed Senior First Out Loan Claims shall not receive or retain any property or interest in property on account of such Claims.<br><br>*Impaired – Entitled to Vote* |
| **Senior Last Out Term Loan Claims** | Senior Last Out Term Loan Claims shall be allowed in the outstanding principal amount of $[•], plus all accrued interest, costs, fees, and expenses under the Prepetition Credit Agreement.<br><br>On the Plan Effective Date, or as soon as reasonably practicable after each distribution date, holders of allowed Senior Last Out Term Loan Claims will receive their *pro rata* share of the sum of the amount of cash available for distribution to holders of allowed Senior Last Out Term |

5

| | |
|---|---|
| | Loan Claims, after payment in full in cash of all senior claims. In the event that allowed Senior First Out Term Loan Claims are not satisfied in full under the Plan, holders of allowed Senior Last Out Loan Claims shall not receive or retain any property or interest in property on account of such Claims. *Impaired – Entitled to Vote* |
| **Holdco Loan Claims** | Holdco Loan Claims shall be allowed in the outstanding principal amount of $[●], plus all accrued interest, costs, fees, and expenses under the Prepetition Credit Agreement. On the Plan Effective Date, or as soon as reasonably practicable after each distribution date, holders of allowed Holdco Loan Claims will receive their *pro rata* share of the sum of the amount of cash available for distribution to holders of allowed Holdco Loan Claims, after payment in full in cash of all senior claims. In the event that allowed Senior Last Out Term Loan Claims are not satisfied in full under the Plan, holders of allowed Holdco Loan Claims shall not receive or retain any property or interest in property on account of such Claims. *Impaired – Entitled to Vote* |
| **General Unsecured Claims:** | On the Plan Effective Date, or as soon as reasonably practicable after each distribution date, holders of allowed General Unsecured Claims will receive (i) their *pro rata* share of a cash pool in the aggregate amount of $[●] as a carve out of the Prepetition Lenders' collateral and (ii) their *pro rata* share of the sum of the amount of cash available for distribution to holders of allowed General Unsecured Claims, after payment in full in cash of all senior claims. In the event that Holdco Loan Claims are not satisfied in full under the Plan, holders of allowed General Unsecured Claims shall not receive or retain any property or interest in property on account of such Claims. *Impaired – Deemed to Reject; Not Entitled to Vote* |
| **Intercompany Claims:** | Intercompany Claims shall be canceled or receive such other treatment that is acceptable to the Company and the Requisite Consenting Creditor in their respective reasonable discretion. *Impaired or Unimpaired – Non-Voting* |
| **Intercompany Interests:** | Intercompany Interests shall be canceled or receive such other treatment that is acceptable to the Company and the Requisite Consenting Creditors in their respective reasonable discretion. *Deemed to Reject – Non-Voting* |
| **Subordinated Security Claims** | Any Claim or Interest subject to subordination pursuant to section 510 of the Bankruptcy Code shall be cancelled and deemed to reject the Plan, and the holders of any such Claims or Interests will not receive any recovery with respect thereto under the Plan. *Impaired – Deemed to Reject* |
| **Existing Equity Interests** | Holders of Interests issued and outstanding as of the Plan Effective Date shall neither receive nor retain any property of the estates or direct interest in property of the estates; provided, that, in the event that all creditors are paid in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest may receive its share of any remaining assets of the Company consistent with such holder's rights of payment existing immediately prior to the Effective Date. *Impaired – Deemed to Reject – Non-Voting* |

WEIL:\97352223\1\44444.0008

| **General Provisions** | |
|---|---|
| **Cancellation of Loans, Interests, Instruments, Certificates and other Documents:** | Except as provided herein, on the Plan Effective Date, all notes, instruments, certificates evidencing debt of, or equity interests in, the Company, including, without limitation, the Prepetition Credit Agreement, the DIP Credit Agreement, and the Interests, will be cancelled. In addition, on the Plan Effective Date, any registration rights agreements, stockholder agreements, or similar agreements with respect to Interests in Fairway will also be cancelled and any obligations of the Company thereunder will be discharged. |
| **Vesting of Assets:** | On the Plan Effective Date, and if applicable, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors' Estates will vest in the reorganized Debtors or wind down estates, as applicable, free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |
| **Compromise and Settlement:** | The Plan will contain customary provisions for the compromise and settlement of claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of allowed claims and equity interests and their respective distributions take into account and conform to the relative priority and rights of such claims and interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |
| **Releases:** | The Plan will contain standard and customary release provisions mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Exculpation:** | The Plan will contain standard and customary exculpation provisions mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Injunction:** | The Plan will contain standard and customary injunction provisions mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Definitive Documents and Due Diligence:** | This Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents. The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet and the RSA. |
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most beneficial structure for the Company, as agreed to by the Company and the Requisite Consenting Creditors. |
| **Avoidance Actions:** | The Debtors' reorganized estates or wind down estates, as applicable will retain all rights to commence and pursue any causes of action that are expressly preserved and not released under the Plan or transferred (or released) in connection with any Sale Transaction, it being understood that the Debtors' reorganized estates, or wind down estates, as applicable will not retain any claims or causes of action against the "Released Parties" (as such term is defined in the Plan), subject to the carve-out for any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. |

WEIL:\97352223\1\44444.0008

| | |
|---|---|
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Plan Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (e) other purposes. |
| **Resolution of Disputed Claims:** | The Plan will provide customary procedures for the resolution of disputed Claims, including the ability (but not requirement) to establish a claims bar date pursuant to an order of the Bankruptcy Court. Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their allowed Claim, mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Conditions to Effectiveness** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are mutually acceptable to the Company and the Requisite Consenting Creditors.<br><br>The conditions to effectiveness may be waived in writing by the Company together with the Requisite Consenting Creditors. |

WEIL:\97352223\1\44444.0008

**<u>Schedule 1</u>**

**DIP Term Sheet**

**FAIRWAY GROUP HOLDINGS CORP.**
**FAIRWAY GROUP ACQUISITION COMPANY**

**SUPERPRIORITY SECURED**
**DEBTOR-IN-POSSESSION CREDIT FACILITY TERM SHEET**

**Summary of Proposed Terms and Conditions**

This Summary of Proposed Terms and Conditions (this "DIP Term Sheet") outlines certain terms of the DIP Facility (as defined herein) proposed to be provided by the DIP Lenders (as defined herein) subject to the conditions herein and as set forth more fully below. This DIP Term Sheet is preliminary, non-binding, and is subject to continued due diligence by the DIP Lenders, and remains subject to the execution of definitive documentation in form and substance reasonably acceptable to the DIP Lenders and the Loan Parties. This DIP Term Sheet is for discussion purposes only and does not constitute a commitment, a contract to provide a commitment, or any agreement by the DIP Lenders. This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to outline certain basic items around which the DIP Lenders and the Loan Parties currently believe a financing could be structured. In addition, the pricing and terms included herein are based on market conditions on the date hereof and are subject to change. The Loan Parties are not authorized to disclose the terms contained herein to any person other than their professional advisors, who shall agree to maintain its confidentiality.

| | |
|---|---|
| **Borrower:** | Fairway Group Acquisition Company ("FGAC"), the borrower under the existing Prepetition Credit Agreement[1] (the "Borrower"), in its capacity as a debtor and debtor-in-possession in a case (together with the cases of its affiliated debtors and debtors-in-possession, the "Chapter 11 Cases") to be filed under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This DIP Term Sheet assumes that the |

---

[1]   Reference is hereby made to that certain Super Senior Credit Agreement dated as of August 28, 2018 (as may be amended, restated, supplemented or otherwise modified from time to time, including by that certain First Amendment to Super Senior Credit Agreement, dated as of July 29, 2019 and that certain Second Amendment to and Extension under Super Senior Credit Agreement, dated as of August 28, 2019, and by that certain Third Amendment and Limited Waiver to Super Senior Credit Agreement, dated as of October 7, 2019, the "Prepetition Credit Agreement"; together with any Loan Document (as defined in the Prepetition Credit Agreement) and any other document related to or evidencing the loans and obligations thereunder (collectively, the "Prepetition Loan Documents")), among Holdings, Borrower, certain subsidiaries of Holdings (together with the Borrower and Holdings, collectively, the "Loan Parties" and each a "Loan Party"), Ankura Trust Company, LLC ("Ankura"), as administrative agent (in such capacity, the "Prepetition Agent") for the lenders from time to time party thereto (each, a "Prepetition Lender" and collectively, the "Prepetition Lenders"; each Prepetition Lender holding New Term Loans; a "Prepetition New Term Loan Lender"; and collectively, the "Prepetition New Term Loan Lenders"; each Prepetition Lender holding L/C Loans, a "Prepetition L/C Lender"; and collectively, the "Prepetition L/C Lenders"; each Prepetition Lender holding Senior First Out Loans, a "Prepetition Senior First Out Lender"; and collectively, the "Prepetition Senior First Out Lenders"; each Prepetition Lender holding Senior Last Out Loans, a "Prepetition Senior Last Out Lender" and collectively, the "Prepetition Senior Last Out Lenders"; and each Prepetition Lender holding Holdco Loans, a "Prepetition Holdco Lender"; and collectively, the "Prepetition Holdco Lenders") and each of the other persons party thereto. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Prepetition Credit Agreement, the RSA Term Sheet to which this term sheet is attached as Schedule 1 thereto, or the Restructuring Support Agreement (the "RSA"), to which the RSA Term Sheet is attached as Exhibit A thereto, as applicable.

Borrower, Fairway Group Holdings Corp. ("<u>Holdings</u>") and each of the other Guarantors (as defined herein) will file voluntary proceedings simultaneously under the Bankruptcy Code in the Bankruptcy Court and will request joint administration of the Chapter 11 Cases.

| | |
|---|---|
| **Guarantors:** | Holdings and each of the Borrower's existing and future direct and indirect subsidiaries (collectively, the "<u>Guarantors</u>"), in their capacities as debtors and debtors-in-possession in the Chapter 11 Cases, on a joint and several basis (together with the Borrower, each individually a "<u>Debtor</u>", and collectively, the "<u>Debtors</u>"). |
| **DIP Agent:** | Ankura (in such capacity, together with its successors and assigns, the "<u>DIP Agent</u>"). |
| **DIP Lenders:** | Certain of the Prepetition New Term Loan Lenders and Prepetition L/C Lenders will, either directly or through one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such person) (such participating funds, collectively, the "<u>DIP Lenders</u>"), finance the New Money DIP Facility (as defined herein) and participate in the New Money DIP Commitments (as defined herein) on a pro rata basis, determined based on the outstanding principal amount of New Term Loans and L/C Loans (collectively, the "<u>Prepetition Super Senior Loans</u>"), excluding any accrued interest and fees, under the Prepetition Credit Agreement (such Prepetition Super Senior Loans, together with accrued interest and fees, the "<u>Prepetition Super Senior Obligations</u>"), held by the DIP Lenders or their affiliated funds as of the date of the commencement of the Chapter 11 Cases (the "<u>Petition Date</u>"). |
| **Type and Amount of the DIP Facility:** | A secured superpriority priming debtor-in-possession non-amortizing facility comprised of: |

    (i)    a new money credit facility in an aggregate principal amount of $20 million (the "<u>New Money DIP Facility</u>"; the DIP Lenders' commitments under the New Money DIP Facility, the "<u>New Money DIP Commitments</u>"; the loans under the New Money DIP Facility, the "<u>New Money DIP Loans</u>"; each DIP Lender's claim under the New Money DIP Facility, a "<u>New Money DIP Claim</u>"; and collectively, the "<u>New Money DIP Claims</u>"; and proceeds received by the Borrower from the New Money DIP Loans and the New Money Delayed Draw DIP Loans (as defined herein), the "<u>DIP Proceeds</u>");

    (ii)    a roll up loan facility (the "<u>Roll-Up DIP Facility</u>"; together with the New Money DIP Facility, the "<u>DIP Facility</u>"; and the applicable DIP Lenders' commitments under the Roll-Up DIP Facility, the "<u>Roll-Up DIP Commitments</u>"; together with the New Money DIP Commitments, the "<u>DIP Commitments</u>") pursuant to which DIP Lenders shall be deemed to make loans under the Roll-Up DIP Facility (the loans under the Roll-Up DIP Facility, the "<u>Roll-Up DIP Loans</u>"; together with the New Money

<div align="center">2</div>

DIP Loans, the "<u>DIP Loans</u>"; each DIP Lender's claim under the Roll-Up DIP Facility, a "<u>Roll-Up DIP Claim</u>"; and collectively, the "<u>Roll-Up DIP Claims</u>"; and together with the New Money DIP Claims and the New Money Delayed Draw DIP Loans (as defined herein), the "<u>DIP Claims</u>"). Each DIP Lender shall have the entire amount of its (or its designated affiliates') Prepetition Super Senior Obligations "rolled-up" into Roll-Up DIP Loans upon entry of the Final DIP Order and the Draw Date occurring thereafter and in connection therewith, which Roll-Up DIP Loans shall be deemed used to satisfy and discharge the Prepetition Super Senior Obligations held by such DIP Lenders (or their designated affiliates); and

(iii)   a new money delayed draw credit facility in an aggregate principal amount of $5 million (the "<u>New Money Delayed Draw DIP Facility</u>"; the DIP Lenders' commitments under the New Money Delayed DIP Facility, the "<u>New Money Delayed Draw DIP Commitments</u>"; the loans under the New Money Delayed Draw DIP Facility, the "<u>New Money Delayed Draw DIP Loans</u>"; each DIP Lender's claim under the New Money Delayed Draw DIP Facility, a "<u>New Money Delayed Draw DIP Claim</u>"; and collectively, the "<u>New Money Delayed Draw DIP Claims</u>"; <u>provided</u> that the New Money Delayed Draw DIP Loans shall only be funded (x) at the election of the Debtors and (y) with the consent of the Requisite DIP Lenders (which shall be in the sole and absolute discretion of the Requisite DIP Lenders) (the "<u>New Money Delayed Draw Election</u>"); and <u>provided</u> <u>further</u> that upon the New Money Delayed Draw Election, each DIP Lender shall be deemed to hold an New Money Delayed Draw DIP Commitment in an amount equal to (on a percentage basis) such DIP Lender's New Money DIP Commitment.  For the avoidance of doubt, the disbursement of New Money Delayed Draw DIP Loans shall not result in any roll-up of Prepetition Obligations.

The New Money DIP Claims, Roll-Up DIP Claims, and New Money Delayed Draw DIP Claims shall be *pari passu* in right of payment and collateral priority, and shall be treated the same in all other respects unless expressly specified herein or in the DIP Documents.

Following the date (the "<u>Closing Date</u>") of the satisfaction or waiver by Requisite DIP Lenders (as defined herein) of the relevant "Conditions Precedent to the Closing of the DIP Facility," which shall include entry by the Bankruptcy Court of the Interim DIP Order authorizing and approving the DIP Facility, (1) the New Money DIP Loans may be incurred as follows: (x) up to $15 million under the DIP Facility to be drawn in one drawing on the Closing Date (the "<u>Initial Funding Loan</u>") and (y) a draw equal to the remaining undrawn New Money DIP Commitments upon entry of an order approving the DIP Facility on a final basis (the "<u>Final DIP Order</u>"; together with the Interim DIP Order, the "<u>DIP Orders</u>") and (2) following entry of the Final DIP Order and ending on the date prior to the date that is the earlier of the DIP Termination Date or effective date of the Chapter 11 Plan, a draw in

3

an amount not to exceed the New Money Delayed Draw DIP Commitments (as defined herein), in each case subject to the terms and conditions provided herein (the date of any draw under the DIP Facility pursuant to clause (1)(x), (1)(y) or (2), a "Draw Date").

Once repaid, the New Money DIP Loans and New Money Delayed Draw DIP Loans, if funded, incurred under the DIP Facility cannot be reborrowed. For the avoidance of doubt, the New Money DIP Commitments will be permanently reduced by the amount of New Money DIP Loans made on each Draw Date.

| | |
|---|---|
| **Credit Bidding:** | The DIP Orders (as defined herein) and the DIP Loan Documents shall provide that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization (i) the Prepetition Agent shall have the right to credit bid the full amount of all amounts due and outstanding under the Prepetition Loan Documents (the "Prepetition Obligations"), at the direction of the "Required Lenders" (as such term is defined in the Prepetition Credit Agreement), and (ii) the DIP Agent shall have the right to credit bid all amounts outstanding under the DIP Facility at the direction of the Requisite DIP Lenders (as defined herein), in each case, in accordance with section 363(k) of the Bankruptcy Code. |
| **Closing Date:** | The date of the satisfaction or waiver by the Requisite DIP Lenders of the relevant "Conditions Precedent to the Closing of the DIP Facility" set forth below (the "Closing Date"). |
| **Maturity:** | All DIP Obligations (as defined herein) will be due and payable in full in cash unless otherwise agreed to by the DIP Lenders on the earliest of (i) the date that is nine months after the Petition Date, (ii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (iii) if the Final Order has not been entered, the date that is 35 calendar days after the Petition Date, (iv) the acceleration of the DIP Loans and the termination of the New Money DIP Commitments upon the occurrence of an event referred to below under "Termination", and (v) the Effective Date (any such date, the "DIP Termination Date"). Principal of, and accrued interest on, the DIP Loans and all other amounts owing to the DIP Agent and/or the DIP Lenders under the DIP Facility shall be payable on the DIP Termination Date. |
| **Budget:** | The "Budget" shall consist of a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and incremental capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases (including professional fees), and working capital and other general corporate needs, which forecast shall be in form and substance reasonably satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders (such budget shall be supplemented in the |

4

manner required  pursuant to the Financial Reporting Requirements).

**Use of Proceeds:**

The New Money DIP Loans and New Money Delayed Draw DIP Loans, if funded, shall be used to provide working capital, for general corporate purposes and to fund the Chapter 11 Cases, in each case subject to the Budget (including Permitted Variances (as defined herein)) and the terms and conditions of the DIP Credit Agreement and the DIP Orders, including, without limitation, to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and the consummation of the Debtors' Chapter 11 Plan, and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility.

Without in any way limiting the foregoing, no DIP Collateral (as defined herein), DIP Proceeds, any portion of the Carve-Out (as defined herein) or any other amounts may be used directly or indirectly by any of the Debtors, the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>Committee</u>"), if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or *pari passu* with, the DIP Liens or the Prepetition Liens (as defined herein) (except to the extent expressly set forth herein); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such) (collectively, the "<u>Released Parties</u>"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents or the Prepetition Obligations; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the Prepetition Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents, or (B) the Prepetition Agent or the Prepetition Lenders under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and the

5

DIP Orders); or (vi) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined herein) has occurred; provided, however, that no more than $100,000 in the aggregate of the DIP Collateral, the Carve Out, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by the Committee, if any, to investigate claims and/or liens of the Prepetition Agent and Prepetition Lenders under the Prepetition Credit Agreement.

| | |
|---|---|
| **Documentation:** | The DIP Facility will be evidenced by a credit agreement (the "DIP Credit Agreement") to be in form consistent with the Prepetition Credit Agreement (with such modifications as are necessary to reflect the terms set forth in this DIP Term Sheet and to reflect administrative agency and operational matters reasonably acceptable to the DIP Agent and the Debtors and the nature of the DIP Facility as a debtor-in-possession facility and other modifications as may be reasonably agreed between DIP Agent (acting at the direction of the Requisite DIP Lenders) and the Debtors, the "Documentation Principles"), security documents, guarantees and other legal documentation (collectively, together with the DIP Credit Agreement, the "DIP Loan Documents"), which DIP Loan Documents shall be in form and substance consistent with the Documentation Principles, this DIP Term Sheet and otherwise satisfactory to the DIP Agent and the DIP Lenders. |
| **Controlled Accounts:** | The Debtors shall use commercially reasonable efforts to enter into one or more deposit account control agreements within three weeks of the Closing Date, with respect to all accounts holding the DIP Proceeds (collectively, the "Controlled Accounts"), which establish "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the DIP Agent for the benefit of the DIP Lenders, in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders. The DIP Credit Agreement shall require the Debtors to maintain the DIP Proceeds (including any intra-company transfers of DIP Proceeds) in the Controlled Accounts except as permitted to be used in accordance with the Budget (including Permitted Variances). From and after the Closing Date, all cash collateral (other than cash collateral held as security by issuers of letters of credit as of the Petition Date) must be held in Controlled Accounts. |
| **Interest:** | The DIP Loans will bear interest at 10.00% *per annum*. |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **Default Interest:** | Upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Documents, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 2.00% *per annum*. |
| **Fees:** | An administrative agency fee set forth in a separate fee letter payable in cash |

6

to the DIP Agent on the Closing Date.[2]

A commitment fee equal to 4.00% (the "Commitment Fee") on the entire New Money DIP Commitments, which shall be earned upon entry of the Interim DIP Order, with such Commitment Fee to be shared on a pro rata basis by the DIP Lenders. The Commitment Fee shall be paid as follows: (i) 2.00% shall be paid on the Closing Date in the form of Original Issue Discount ("OID") and (ii) 2.00% shall be paid in cash to the DIP Agent (for distribution to the DIP Lenders) on the earlier of the DIP Termination Date or effective date of the Chapter 11 Plan. For the avoidance of doubt, no Commitment Fee shall be earned or payable on the Roll-Up DIP Commitments.

A structuring fee equal to 3.00% (the "Structuring Fee") on the entire New Money DIP Commitments, which shall be earned upon entry of the Interim DIP Order, with such Structuring Fee to be shared on a pro rata basis solely by DIP Lenders affiliated with Brigade Capital Management and Special Situations Investing Group based on their pro rata share of the New Money DIP Commitments. The Structuring Fee shall be paid in cash on the Closing Date. For the avoidance of doubt, no Structuring Fee shall be earned or payable on the Roll-Up DIP Commitments.

For the avoidance of doubt, the Commitment Fee and Structuring Fee shall also be paid on account of the New Money Delayed Draw DIP Commitments if funded; provided that the OID portion of the Commitment Fee shall be paid on the date the New Money Delayed Draw DIP Loans are disbursed.

**Voluntary Prepayments:**    Voluntary prepayments of the DIP Loans shall be permitted at any time, without premium or penalty.

**Mandatory Prepayments:**    The DIP Credit Agreement will contain customary mandatory prepayment events for financings of this type consistent with the Documentation Principles and others agreed to by the DIP Lenders and the Borrower ("Mandatory Prepayments"), including, without limitation, prepayments from proceeds of (i) asset sales, (ii) insurance and condemnation proceeds, subject to reinvestment rights to be agreed upon by the Debtors and the Requisite DIP Lenders, (iii) equity or debt issuances, (iv) extraordinary receipts, (v) any cash or cash equivalents cash collateralizing any letter of that is returned to the Borrower or any Guarantor for its own account and (vi) any cash or cash equivalents returned to the Borrower or any Guarantor from rent reserves or security deposits returned to the Borrower or any Guarantor upon the assignment of a lease or otherwise, in each case, received by the Borrower or any of the Guarantors and subject to exceptions to be agreed; provided that the aggregate net cash proceeds utilized for a Mandatory Prepayment on account of the sale of the Stalking Horse Package (as defined below) shall be limited in an amount determined by Requisite DIP Lenders in good faith and in consultation with the Debtors and their advisors, if necessary, to ensure sufficient liquidity to fund the remaining disbursements set forth in the Budget in effect at such time after taking into account the Debtors' (i) cash

---

[2] Agency fee will be set forth in a separate fee letter.

7

on hand and (ii) anticipated receipts and disbursements. Mandatory Prepayments will result in a permanent reduction of the DIP Facility.

| **Amortization:** | None. |
|---|---|

**Priority and Security under DIP Facility:**

All obligations of the Borrower and the Guarantors to the DIP Agent and the DIP Lenders under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due, or any exposure of each DIP Lender and its affiliates in respect of cash management incurred on behalf of the Borrower or any Guarantor under the DIP Facility (collectively, the "DIP Obligations"), shall be secured by the following liens and security interests (the "DIP Liens"):

(a)      subject to the Carve Out and subject only to existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Agent under the DIP Loan Documents, but only to the extent that such liens are valid, enforceable and non-avoidable liens as of the Petition Date (the "Permitted Liens"), pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in the Collateral (as defined in the Prepetition Loan Documents) securing the Prepetition Obligations, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date securing the Prepetition Obligations under the Prepetition Loan Documents (the "Prepetition Liens"), which Prepetition Liens shall be primed by, and made subject and subordinate to, the perfected first priority senior priming liens and security interests to be granted to the DIP Agent for the benefit of the DIP Lenders, which senior priming liens and security interests in favor of the DIP Agent for the benefit of the DIP Lenders shall also be senior to the Prepetition Lender Adequate Protection Liens (as defined herein);

(b)      subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "Unencumbered Property");

(c)      subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a perfected lien or security interest on the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and

(d)      subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts.

The property referred to in the preceding clauses (a), (b), (c) and (d) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of the Borrower and the Guarantors, whether now owned or hereafter acquired and

WEIL:\97352148\2\44444.0008

wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action (including, subject to entry of the Final Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof.

The DIP Liens shall be effective and perfected as of the entry of the Interim DIP Order (as defined herein) and without necessity of the execution, filing or recording of security agreements, pledge agreements, control agreements, financing statements or other agreements. However, the DIP Agent may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence.

Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets held by the Debtors in trust. Nothing herein shall limit, subordinate, or constitute a waiver of any rights and priorities of claimants with statutory trust rights, including those afforded under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et. seq or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181 et. seq.

| | |
|---|---|
| **Superpriority DIP Claims:** | All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out. |

The DIP Claims will, at all times during the period that the DIP Loans remain outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, including (a) any claims allowed pursuant to the obligations under the Prepetition Loan Documents, and (b) the Prepetition Lender Superpriority Claims (as defined herein), subject only to the Carve Out.

| | |
|---|---|
| **Carve Out:** | "Carve Out" means an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all budgeted and accrued unpaid fees, |

9

disbursements, costs and expenses incurred by the Committee (if any) pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Agent at the direction of the Requisite DIP Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent at the direction of the Requisite DIP Lenders of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap") and (v) subject to entry of the Bid Procedures Order (as defined herein), amounts used to pay the Termination Payment and any of Buyer's Damages, as each of those terms are defined in and pursuant to the Stalking Horse Agreement (as defined herein), provided that such amounts, in the aggregate, shall not exceed three (3%) of the Cash Purchase Price (as such term is defined in and.in accordance with the Stalking Horse Agreement).  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by e-mail (or other electronic means) by the DIP Agent at the direction of the Requisite DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On the day on which a Carve Out Trigger Notice is given by the DIP Agent at the direction of the Requisite DIP Lenders to the Debtors with a copy to counsel to the Committee (if any) (the "Carve Out Trigger Notice Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor (including any cash collateral) to fund the Professional Fees Escrow Account (as defined herein) in an amount equal to the then unpaid amounts of Estimated Fees and Expenses (as defined herein) in an amount to pay unpaid Allowed Professional Fees prior to any and all other claims. The Debtors shall deposit and hold in trust in the Professional Fees Escrow Account an amount equal to the Post-Carve Out Trigger Notice Cap, which shall exclusively be used to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap Notwithstanding anything to the contrary herein, following delivery of a Carve Out Trigger Notice, if the DIP Agent (at the direction of the Requisite DIP Lenders) sweeps or forecloses on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors, the DIP Agent shall promptly deposit any cash swept or foreclosed upon after delivery of the Carve-Out Trigger Notice (including cash received as a result of the sale or other disposition of any assets) into the Professional Fees Escrow Account until it is fully funded.  Further, notwithstanding anything to the contrary herein, (i) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Professional Fees

10

Escrow Account, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the adequate protection liens and claims, and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

Prior to the occurrence of an Event of Default, the Debtors shall be permitted to pay compensation and reimbursement of all Allowed Professional Fees of Estate Professionals, as the same may be due and payable, and such payments shall not reduce the Carve Out. Upon the receipt of the Carve Out Trigger Notice, the right of the Debtors to pay professional fees using Cash Collateral outside the Carve Out shall terminate and the Debtors shall provide immediate notice to all Estate Professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay professional fees to such Estate Professionals using Cash Collateral is subject to and limited by the Carve Out. Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

Starting with the first full calendar week following the Petition Date, each Estate Professional shall deliver to the Debtors a statement (each such statement, a "Weekly Statement") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Estate Professional (through Saturday of such week, the "Calculation Date") (the "Estimated Fees and Expenses"). No later than one business day after the delivery of a Carve-Out Trigger Notice, each Estate Professional shall deliver one additional statement to the Debtors setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of the Carve-Out Trigger Notice, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).

The Debtors shall on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors which shall be reported to the DIP Agent, or if an estimate is not provided, the total budgeted weekly fees of Estate Professionals for the prior week set forth in the Budget, into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition Secured Party (the "**Professional Fees Escrow Account**"). The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim or final orders of the Court; provided that when all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the

11

Professional Fees Escrow Account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and the DIP Orders; and provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.  Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Estate Professionals, including with respect to obligations arising out of the Carve-Out (with a reversionary interest to the Debtors of any amount remaining in the Professional Fees Escrow Account after all allowed Professional Fees are satisfied in full). Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute Cash Collateral or assets of the Debtors' estates; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Escrow Account, if any, after all allowed Professional Fees are satisfied in full.

Nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any Estate Professionals or any other person or entity.

**Investigation Rights:**   The Committee (to the extent one is appointed) shall have a maximum of sixty (60) calendar days from entry of the Final DIP Order and, to the extent a Committee is not appointed, any party in interest (other than the Debtors) shall have a maximum of seventy-five (75) calendar days from entry of the Final DIP Order (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Debtors' stipulations, or any other stipulations contained in the DIP Orders, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the Prepetition Loan Documents, or to assert any claim or cause of action against the Prepetition Agent or the Prepetition Lenders arising under or in connection with the Prepetition Loan Documents or the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Obligations, or otherwise.  The Investigation Period may only be extended with the prior written consent of the DIP Agent (acting at the direction of the Requisite DIP Lenders), or pursuant to an order of the Bankruptcy Court.  Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim DIP Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any Chapter 7 Trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed and the Prepetition Liens shall be deemed to constitute valid, binding and

12

enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations. Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the DIP Orders shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge. For the avoidance of doubt, the DIP Orders shall include language that the investigation rights afforded to the Committee will not constitute the Debtors' or DIP Lenders' recognition, consent, or agreement not to object to, the Committee's standing to assert any claim or cause of action. To the extent that there is a successful Challenge to any Prepetition Obligations that are converted into the Roll-Up DIP Facility, the Roll-Up DIP Facility shall be automatically unwound and deemed null and void in an equivalent amount.

| | |
|---|---|
| **Conditions Precedent to the Closing of the DIP Facility:** | The DIP Credit Agreement will contain customary conditions precedent to closing mutually acceptable to the Debtors, the DIP Agent and the DIP Lenders, including but not limited to the following conditions precedent, each of which shall be subject to waiver with the consent of the Debtors and the DIP Agent at the direction of the Requisite DIP Lenders: |

- All documentation relating to the DIP Facility shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders, and shall have been duly executed and delivered by all parties thereto.

- All reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of (i) the DIP Agent (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent's outside counsel, Davis Polk & Wardwell LLP ("DPW") and any successor counsel, and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in connection with the Debtors' Chapter 11 Cases), (ii) the Prepetition Lenders and DIP Lenders represented by King & Spalding LLP ("K&S") (collectively, the "Ad Hoc Group") (limited, in the case of counsel, to all reasonable and documented fees, costs, disbursements and expenses of the Ad Hoc Group's outside counsel, K&S, and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection with the Debtors' Chapter 11 Cases), and (iii) any other professional advisors retained by the DIP Agent at the direction of the Requisite DIP Lenders in their reasonable discretion, or the Ad Hoc Group, in their reasonable discretion, shall have been paid in full in cash (which payment may be made from DIP Proceeds), in each case to the extent invoices for any such accrued and unpaid amounts are provided to the Debtors no later than three (3) Business Days prior to the Closing Date.

13

- The DIP Agent and the DIP Lenders shall have received a Budget in form and substance reasonably satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders.

- All first day motions, including those related to the DIP Facility, filed by the Debtors and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders.

- Other than the DIP Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Agent at the direction of the DIP Lenders of its rights as a secured party with respect to the DIP Collateral.

- Other than, in each case, as a result of the commencement and continuation of the Chapter 11 Cases, the events leading up to the Chapter 11 Cases, the effect of the bankruptcy, the conditions in the industry in which the Borrower operates in as existing on the Closing Date and/or the consummation of transactions contemplated by the Debtors' "first day" pleadings reviewed by the DIP Agent and the Requisite DIP Lenders, since the Petition Date there shall have occurred no event, circumstance or condition which has resulted, or could reasonably be expected to result, in a material adverse change in (i) the business, operations, properties or condition (financial or otherwise) of the Debtors and their subsidiaries, collectively, (ii) the legality, validity or enforceability of any DIP Loan Documents or the DIP Orders, (iii) the ability of the Borrower or the Guarantors, taken as a whole, to perform their payment obligations under the DIP Loan Documents, (iv) the perfection or priority of the DIP Liens granted pursuant to the DIP Loan Documents or the DIP Orders, or (v) the rights and remedies of the DIP Agent and the DIP Lenders under the DIP Loan Documents taken as a whole (any of the foregoing being a "<u>Material Adverse Change</u>").

- Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed to the DIP Agent prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby.

- Other than as a result of or in connection with the Chapter 11 Cases, all governmental and third party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Facility, if any, shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Agent at the direction of the Requisite DIP Lenders in their reasonable discretion) and

14

shall remain in effect.

- Subject to the entry of the Interim DIP Order, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid and perfected lien on and security interest in the DIP Collateral of the Debtors on the basis and with the priority set forth herein.

- The Bankruptcy Court shall have entered an interim order (the "Interim DIP Order") within three (3) calendar days following the Petition Date, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders, which Order shall include, without limitation, copies of the DIP Facility and the initial Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the DIP Agent acting at the direction of the Requisite DIP Lenders and otherwise as required by applicable Bankruptcy Law, (i) authorizing and approving the New Money DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) authorizing the lifting or modification of the automatic stay to permit the Borrower and the Guarantors to perform their obligations, and the DIP Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of cash collateral and providing for adequate protection in favor of the Prepetition Lenders as and to the extent provided herein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent), the Requisite DIP Lenders, and the Debtors, in their respective discretion, in each case, on the terms and conditions set forth herein; which Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders); provided that, for the avoidance of doubt, the Interim DIP Order need not include authorization and approval of the Roll-Up DIP Facility, which shall be deferred to and included in the Final DIP Order.

- The Debtors shall have entered into the RSA with the Requisite Consenting Lenders in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders.

- The DIP Agent shall have received, at least three (3) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

| | |
|---|---|
| **Conditions Precedent to Borrowing New Money DIP Loans and New Money Delayed Draw DIP Loans (if** | In addition to the satisfaction of the conditions on the Closing Date, the DIP Credit Agreement will contain only the following conditions precedent to borrowings: |

15

**funded):**

- No Default or Event of Default shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the funding of the New Money DIP Loans or New Money Delayed Draw DIP Loans, if funded, or would result from such borrowing of the New Money DIP Loans or New Money Delayed Draw DIP Loans, if funded.

- The representations and warranties of each Borrower and each Guarantor set forth in the DIP Credit Agreement shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the Closing Date or on and as of any Draw Date thereafter, as applicable, in each case immediately after giving effect to the funding of any New Money DIP Loans and New Money Delayed Draw DIP Loans, and to the application of the proceeds therefrom as though made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date).

- The making of the New Money DIP Loans shall not violate any requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

- The making of the New Money DIP Loans shall be authorized pursuant to the Interim DIP Order or the Final DIP Order, as applicable.

- The entry of the Interim DIP Order or the Final DIP Orders (as applicable).

The RSA shall remain in force and effect according to its terms as to the Debtors and the Requisite Consenting Creditors.

16

| | |
|---|---|
| **Representations and Warranties:** | The DIP Credit Agreement will contain the following representations and warranties (which will be applicable to each Debtor and its subsidiaries) consistent with the Documentation Principles and to be made as of (x) the date the Borrower and the Guarantors execute the DIP Loan Documents, (y) the Closing Date, and (z) any Draw Date thereafter: representations and warranties regarding valid existence, requisite power, due authorization, no conflict with the Interim DIP Order or the Final DIP Order (as applicable) or applicable law, governmental consent, enforceability of DIP Loan Documents, accuracy of financial statements, and all other non-forward looking information provided, compliance with law, absence of Material Adverse Change, no default under the DIP Loan Documents, taxes, subsidiaries, ERISA, pension and benefit plans, ownership of properties and necessary rights to intellectual property, insurance, inapplicability of Investment Company Act, compliance with OFAC, money laundering, PATRIOT Act and other anti-terrorism laws and anti-corruption laws, continued accuracy of representations and continued effectiveness of the applicable DIP Order and each other order of the Bankruptcy Court with respect to the DIP Facility. |
| **Affirmative and Negative Covenants:** | The DIP Credit Agreement will contain customary affirmative and negative covenants to be consistent with the Documentation Principles, including, the following: |

- Deliver to the DIP Agent and the DIP Lenders and their counsel for review and comment, as soon as commercially reasonable, and in any event not less than two (2) Business Days prior to filing (or as soon thereafter as is reasonably practicable under the circumstances), upon request, all pleadings, motions and other documents material to the DIP Agent or DIP Lenders (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court.

- Promptly deliver, upon receipt of same, to the DIP Agent and the DIP Lenders copies of any term sheets, proposals, presentations or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or more of the Debtors.

- Comply in all material respects with laws (including without limitation, the Bankruptcy Code, ERISA, environmental laws, OFAC, money laundering laws, PATRIOT Act and other anti-terrorism laws and anti-corruption laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books and records.

- Conduct all transactions with affiliates of the Debtors on terms no less favorable to the Debtors than those obtainable in arm's length transactions, including, without limitation, restrictions on management fees paid to affiliates.

- Maintain a cash management system as required by the DIP Orders and

17

otherwise the Prepetition Credit Agreement.

- Not make or commit to make payments to critical vendors in respect of prepetition amounts in excess of $7.5 million in the aggregate (or as otherwise contemplated by the Chapter 11 Plan).

- Delivery of the Budget, updated on a weekly basis and adherence to the Budget, subject to Permitted Variances.

- (i) Actual aggregate disbursements shall not exceed the aggregate amount of disbursements in the Budget for the applicable period by more than the Permitted Variances, and (ii) actual aggregate cash receipts (excluding DIP Proceeds that may be deemed a receipt) during the applicable period shall not be less than the aggregate amount of such cash receipts in the Budget for such period by more than the Permitted Variances.

  For purposes hereof, the term "Permitted Variances" will mean, for the first two weeks after the Closing Date and on a rolling two-week basis thereafter, to be tested commencing on the third Friday following the Closing Date and every other Friday thereafter (each such period, the "Testing Periods"): (i) all favorable variances, (ii) (x) an unfavorable variance of no more than 10% for each of actual aggregate receipts and disbursements (excluding professional fees and expenses), (y) an unfavorable variance of no more than 10% for professional fee and expense disbursements, and (z) an unfavorable variance of no more than the greater of $500,000 and 10% of net cash flow (excluding professional fees and expenses), as compared to the budgeted aggregate receipts, disbursements (excluding professional fees and expenses), professional fee and expense disbursements, and net cash flow (excluding professional fees and expenses), respectively, set forth in the Budget with respect to the applicable Testing Period; provided, that any disbursements in such Testing Period made from proceeds of favorable variances with respect to receipts in such Testing Period shall not be counted as disbursements for purposes of calculating unfavorable variances. The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Agent and the DIP Lenders not later than Friday immediately following each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Agent at the direction of the Requisite DIP Lenders.

- Consistent with the Documentation Principles and subject to the Budget, not incur or assume any additional debt or contingent obligations in respect of debt, give any guaranties in respect of debt, create any liens, charges or encumbrances or incur additional material lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits; not amend its charter or by laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale

18

leaseback transaction) outside the ordinary course of business and beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the DIP Agent for the benefit of the DIP Lenders; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrower; in each case, subject to customary exceptions or baskets as may be agreed.

- Other than the DIP Obligations, not prepay, redeem, purchase, defease, exchange or repurchase any debt or amend or modify any of the terms of any such debt or other similar agreements entered into by any Debtor or its subsidiaries.

- Not make any loans, advances, capital contributions or acquisitions, form any joint ventures or partnerships or make any other investments in subsidiaries (other than among the Debtors) or any other person, subject to certain exceptions to be agreed.

- Not make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions (other than among the Debtors, from Debtors to non-Debtor affiliates in the ordinary course, among non-Debtors, and from non-Debtors to Debtors).

- Not make, commit to make, or permit to be made any bonus payments to executive officers of the Debtors and their subsidiaries in excess of the amounts set forth in the Budget.

- Not permit any change in ownership or control of any Debtor or any subsidiary or any change in accounting treatment or reporting practices, except as required by GAAP or as permitted or contemplated by the RSA, the Chapter 11 Plan or the DIP Credit Agreement.

- Without the prior written consent of the Requisite DIP Lenders, not make or permit to be made any change to the DIP Orders or any other order of the Bankruptcy Court with respect to the DIP Facility.

- Not permit the Debtors to seek authorization for, and not permit the existence of, any claims other than that of the DIP Lenders entitled to a superpriority under section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the DIP Lenders' section 364(c)(1) claim, except for the Carve Out.

- The Debtors shall comply with the Milestones (as defined herein).

| | |
|---|---|
| **Financial Reporting Requirements:** | The Borrower shall provide to the DIP Agent for the benefit of the DIP Lenders (hereinafter the "Financial Reporting Requirements"): (i) monthly operating reports of the Debtors and their subsidiaries, within thirty (30) calendar days of month end, certified by the Debtors' chief financial officer; (ii) quarterly consolidated financial statements of the Debtors and their subsidiaries within sixty (60) calendar days of fiscal quarter end, certified by the Borrower's chief financial officer; (iii) annual audited consolidated financial statements of the Debtors and their subsidiaries within one-hundred |

19

twenty (120) calendar days of fiscal year end, certified with respect to such consolidated statements by independent certified public accountants acceptable to the DIP Lenders (provided that the Borrower's existing independent certified public accountants are acceptable) which shall not be qualified in any material respect as to scope but may contain a qualification with respect to the Chapter 11 Cases; (iv) following delivery of the Budget, on every Friday during the Chapter 11 Cases, an updated Budget, in each case, in form reasonably satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders and substance satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders for the subsequent 13 week period consistent with the form of the initial Budget and such updated Budget shall become the "Budget" for the purposes of the DIP Facility upon the DIP Agent's acknowledgement at the direction of the Requisite DIP Lenders that the proposed updated Budget is substantially in the form of the initial Budget and in substance satisfactory to the DIP Agent (provided, that, until a new Budget has been approved by the DIP Agent at the direction of the Requisite DIP Lenders, the most recently approved Budget shall govern); and (v) beginning on the third Friday following the Closing Date, and every other Friday thereafter, a variance report (the "<u>Variance Report</u>") setting forth actual cash receipts, disbursements (excluding professional fees and expenses), professional fee and expense disbursements and net cash flow (excluding professional fees and expenses) of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a cumulative rolling 2-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors).  The Borrower will promptly provide notice to the DIP Agent, for distribution to the DIP Lenders, of any Material Adverse Change.

All deliveries required pursuant to this section shall be subject to the confidentiality provision to be negotiated in the DIP Credit Agreement.

**Other Reporting Requirements:**    The DIP Credit Agreement will contain other customary reporting requirements for similar financings and others determined by the DIP Lenders in their reasonable discretion to be appropriate to the transactions contemplated herein, including, without limitation, with respect to material adverse events, events and notices under other material debt instruments, litigation, contingent liabilities, ERISA or environmental events and consistent with the Documentation Principles (collectively with the financial reporting information described above, the "<u>Information</u>").

20

| | |
|---|---|
| **Chapter 11 Cases Milestones:** | The DIP Credit Agreement will include the following milestones (the "<u>Case Milestones</u>") related to the Debtors' Chapter 11 Cases: |

- No later than three calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

- No later than 30 calendar days after the Petition Date, the Debtors shall have filed a plan of reorganization, in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders.

- No later than 30 calendar days after the Petition Date, the Debtors shall have filed disclosure statement motion and disclosure statement in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders.

- No later than 30 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order setting the date (the "<u>Bar Date</u>") by which proofs of claim for general unsecured creditors must be filed.

- No later than 35 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

- No later than 65 calendar days following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders, approving the Disclosure Statement (the "<u>Disclosure Statement Order</u>").

- No later than 60 calendar days following the Petition Date, the Bar Date shall have occurred.

- No later than 70 calendar days after the Petition Date, the Debtors shall have commenced solicitation on the Chapter Plan.

- No later than 120 calendar days following the Petition Date the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders, confirming the Chapter 11 Plan (the "<u>Plan Confirmation Order</u>").

- No later than 125 calendar days following the Petition Date the effective date (the "<u>Effective Date</u>") of the Chapter 11 Plan shall have occurred.

The DIP Credit Agreement will include the following sale milestones (the "<u>Sale Milestones</u>"; together with the Case Milestones, the "<u>Milestones</u>") related to the Debtors' 363 Sale (as defined herein):

- Prior to the Petition Date, the Debtors shall have entered into a stalking horse purchase agreement (the "<u>Staking Horse Agreement</u>") (in form and substance acceptable to the Requisite DIP Lenders) with Village Supermarket, Inc. (the "<u>Stalking Horse Bidder</u>") for a substantial portion of the Debtors' assets (the "Stalking Horse Package" and, the Stalking Horse Bidder's bid for such Stalking

21

Horse Package, the "<u>Stalking Horse Bid</u>"), and such Stalking Horse Agreement shall not have been terminated by the Stalking Horse Bidder.

- No later than 2 calendar days after the Petition Date, the Debtors shall file a motion (the "<u>Sale Motion</u>"), in form and substance acceptable to the DIP Agent and the Requisite DIP Lenders, requesting (x) an order from the Bankruptcy Court (the "<u>Bid Procedures Order</u>") (i) approving the proposed bid procedures attached to the Sale Motion related to the sale of substantially all of the assets of the Debtors, including the Stalking Horse Package (the "<u>Bid Procedures</u>"), and (ii) authorizing the Debtors to provide the Stalking Horse Bidder with the bid protections set forth in the Stalking Horse Agreement, and (y) an order from the Bankruptcy Court (the "<u>Sale Order</u>") approving the sale of the Debtors' assets to the highest and best bidder for such assets pursuant to Section 363 of the Bankruptcy Code, including the sale of the Stalking Horse Package to the Stalking Horse Bidder or such other higher or better bidder determined in accordance with the Bid Procedures.

- No later than 25 calendar days after the Petition Date, the Debtors shall have obtained the Bid Procedures Order, in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders.

- No later than 50 calendar days after the Petition Date, the Debtors shall have commenced an auction, if applicable, for the Stalking Horse Package.

- No later than 55 calendar days after the Petition Date, the Debtors shall have commenced an auction, if applicable, for the Other Assets (as such term is defined in the Bid Procedures).

- No later than 65 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (the "<u>Stalking Horse Sale Order</u>"), in form and substance reasonably acceptable to the DIP Agent (acting at the direction of the Requisite DIP Lenders), approving the sale of the Stalking Horse Package; provided that if there is no overbid for the Stalking Horse Package, then the Stalking Horse Sale Order shall be entered no later than 50 calendar days after the Petition Date.

- No later than 65 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Agent (acting at the direction of the Requisite DIP Lenders), approving the sale of the Other Assets.

- No later than calendar 68 days after the Petition Date, the Debtors shall have consummated the sale(s) of the Stalking Horse Package to the winning bidder(s) at the applicable Auction, provided if there is no overbid for the Stalking Horse Package, then the Debtors shall have consummated the sale(s) of the Stalking Horse Package no later than 55 days from the Petition Date.

- No later than calendar 70 days after the Petition Date, the Debtors

22

shall have consummated the sale(s) of the Other Assets to the winning bidder(s) at the applicable Auction.

**Events of Default:** The DIP Credit Agreement will contain events of default customarily found in loan agreements for similar financings and other events of default deemed by the DIP Lenders appropriate to the transactions contemplated therein which will be applicable to the Debtors and their subsidiaries (each an "Event of Default"), including, without limitation:

- failure to make payments when due;

- noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);

- breaches of representations and warranties in any material respect;

- failure to satisfy or stay execution of judgments in excess of specified amounts;

- the existence of certain materially adverse employee benefit or environmental liabilities, except for such liabilities as are in existence as of the Closing Date and are set forth on a schedule to the DIP Credit Agreement, and customary ERISA and similar foreign plan events;

- impairment of DIP Loan Documents;

- change in ownership or control, except as contemplated by the Chapter 11 Plan;

- filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Debtors (other than the Chapter 11 Plan) that has not been consented to by the Requisite DIP Lenders;

- filing of a plan of reorganization by the Debtors (other than the Chapter 11 Plan) that does not propose to indefeasibly repay the DIP Obligations in full in cash, unless otherwise consented to by the DIP Agent and the Requisite DIP Lenders;

- any of the Debtors shall file a pleading seeking to vacate or modify any of the DIP Orders over the objection of the DIP Agent or the DIP Lenders constituting the Requisite DIP Lenders;

- entry of an order without the prior written consent of the Requisite DIP Lenders amending, supplementing or otherwise modifying the Order;

- reversal, vacatur or stay of the effectiveness of the DIP Orders except to the extent stayed or reversed within five (5) Business Days (and, other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);

- any violation of the terms of the DIP Orders by the Debtors that are not cured within 3 calendar days (to the extent any such violation is curable);

- dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code;

- appointment of a Chapter 11 trustee or examiner with enlarged powers

23

relating to the operation of the business of the Borrower or any Guarantor;

- any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) such sale is conducted in accordance with the Bid Procedures and (b) the proceeds of such sale will indefeasibly satisfy the DIP Obligations in full in cash;

- failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Agent at the direction of the Requisite DIP Lenders;

- granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Borrower or any Guarantor, in each case, with a fair market value in excess of $100,000;

- the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

- the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, except as provided in the Chapter 11 Plan, without the prior written consent of the Requisite DIP Lenders;

- the Debtors shall seek, or shall support  any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading filed with the Bankruptcy Court, or any other writing to another party in interest by the Debtors), to challenge the validity or enforceability of any of the obligations of the parties under the Prepetition Loan Documents;

- payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the DIP Orders or consented to by the DIP Agent at the direction of the Requisite DIP Lenders;

- expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets;

- cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

- Permitted Variances under the Budget are exceeded for any Test Period without consent of or waiver by the DIP Agent at the direction of the Requisite DIP Lenders;

- any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against any of the Debtors or any of their respective affiliates in a combined aggregate amount in excess of $250,000 unless stayed;

- the termination of the RSA and revocation of the votes to accept the Chapter 11 Plan by Prepetition Lenders that has the effect of causing the

24

percentage of funded debt owned by the Consenting Creditors to fall below 66 $^{2}/_{3}$% of the total amount of Senior First Out Term Loans, it being understood and agreed that the Consenting Creditors shall have the right to revoke their votes to accept the Chapter 11 Plan as provided in the RSA; and

- any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated.

**Termination:** Upon the occurrence and during the continuance of an Event of Default, the DIP Agent, at the direction of the Requisite DIP Lenders shall, by written notice to the Borrower, its counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the DIP Loan Documents and the DIP Orders.

**Remedies:** The DIP Agent and the DIP Lenders shall have customary remedies, including, without limitation, the following:

Without further order from the Bankruptcy Court, and subject to the terms of the DIP Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loans under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right in clauses (a) or (f) of this paragraph, the DIP Agent shall be required to provide seven (7) calendar days written notice to the Debtors, the U.S. Trustee, and the Committee of the DIP Agent's intent to exercise its rights and remedies; provided, further, that neither the Debtors, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the DIP Orders and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan

25

Documents.  The Debtors shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.

The Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in the DIP Orders and in the DIP Loan Documents.

**Adequate Protection:** As adequate protection for the use of the collateral securing the Prepetition Obligations (the "Prepetition Collateral"), the Prepetition Agent, on behalf of and for the benefit of the Prepetition Lenders, and the Prepetition Lenders, shall receive, in each case subject to the Carve Out:

(i) current payment of interest in cash at the non-default rate on the outstanding Prepetition Super Senior Obligations; provided that if the Roll-Up DIP Facility is approved by the court pursuant to the Final Order, such interest payments shall cease and shall no longer be required as adequate protection;

(ii) current payment of all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Prepetition Agent (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of its outside counsel, DPW, and one local counsel shared with the DIP Agent and any successor counsel);

(iii) current payment of all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Ad Hoc Group (limited, in the case of counsel, financial advisors and other outside professionals, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of its outside counsel, K&S, and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection with the Debtors' Chapter 11 Cases);

(iv) replacement liens to the extent of any postpetition diminution in value of the Prepetition Lenders' interest in the Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay, including replacement liens on all Unencumbered Property of the Debtors, which liens will be junior to DIP Liens (the "Prepetition Lender Adequate Protection Liens") and senior to the Prepetition Liens;

(v) superpriority administrative expense claims to the extent of any postpetition diminution in value of the Prepetition Lenders' interest in the Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay (the "Prepetition Lender Superpriority Claims"), which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of

26

the Debtors; and

(vi)    reasonable access to the Debtors' books and records and such financial reports as are provided to the DIP Agent pursuant to provisions (i) through (iii) above of the Financial Reporting Requirements section.

(the foregoing clauses (i)-(v), the "Adequate Protection Package").

The DIP Orders shall provide that the Debtors' agreement to the Milestones and the Budget shall constitute a component of the Adequate Protection Package.

The Interim DIP Order shall include language providing for the payment of all outstanding fees and expenses referenced in the foregoing clauses (i) and (ii) through and including the Petition Date upon entry of the Interim DIP Order.

For the avoidance of doubt, any and all payments made on account of the Prepetition Obligations to the Prepetition Lenders in connection with the Adequate Protection Package shall be distributed in accordance with the waterfall set forth in the Prepetition Credit Agreement.

| | |
|---|---|
| **Marshalling and Waiver of 506(c) and 552(b) Claims:** | The Final DIP Order shall provide that in no event shall the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Prepetition Agent be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral, the Prepetition Collateral, as applicable, and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary. |

Upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, upon the DIP Collateral, or the Prepetition Collateral and (ii) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.

| | |
|---|---|
| **Indemnification:** | The Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Lender and each of their affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, |

27

litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors.   No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

**Expenses**:

The Borrower and each Guarantor shall jointly and severally pay all (i) reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of (a) the DIP Agent (including (and limited, in the case of counsel, to) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent's outside counsel, DPW and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in connection with the Debtors' Chapter 11 Cases, and any successor counsel to each) and any other professional advisors retained by the DIP Agent at the direction of the Requisite DIP Lenders in their reasonable discretion and (b) the Ad Hoc Group (including (and limited, in the case of counsel,) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the Ad Hoc Group's outside counsel, K&S, and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection with the Debtors' Chapter 11 Cases) and any other professional advisors retained by the Ad Hoc Group in their reasonable discretion, in the case of each of the foregoing clauses (a) and (b), in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all DIP Loans under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent and the Ad Hoc Group, and their counsel and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the

28

administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Agent and the Ad Hoc Group (including (and limited, in the case of counsel, to) (x) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of one firm of outside counsel for the DIP Agent and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel) and (y) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of one firm of outside counsel for the Ad Hoc Group and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection therewith) in connection with (A) the enforcement of any rights and remedies under the DIP Loan Documents, (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases, and (C) defending and prosecuting any actions or proceedings arising out of or relating to the Prepetition Obligations, the DIP Obligations, the Liens securing the Prepetition Obligations and the DIP Obligations, or any transaction related to or arising in connection with the Prepetition Loan Documents, the DIP Credit Agreement or the other DIP Documents (in the case of the Prepetition Obligations and the Liens securing the Prepetition Obligations, to the extent provided in the Prepetition Loan Documents).

| | |
|---|---|
| **Assignments and Participations:** | Prior to the occurrence of an Event of Default, assignments (other than assignments to another DIP Lender or an affiliate of any DIP Lender or an Approved Fund (to be defined)) shall be subject to the consent of the Borrower, which consent shall not be unreasonably withheld, delayed or conditioned; provided, that the consent of the Borrower will be deemed to have been given if the Borrower has not responded within three Business Days of a request for such consent.  Following the occurrence of an Event of Default, no consent of the Borrower shall be required for any assignment.  Each DIP Lender shall have the right to sell participations in its DIP Loans, subject to customary voting limitations.  Any assignment by a DIP Lender shall be subject to the terms and conditions of the RSA as long as the RSA is in effect. |
| **Removal of DIP Lenders:** | The Requisite DIP Lenders shall have the right to cause any DIP Lender (under certain situations to be specified in the DIP Credit Agreement) to assign its DIP Loans, DIP Commitment or any other obligations to one or more existing and consenting DIP Lenders. |

WEIL:\97352148\2\44444.0008

| | |
|---|---|
| **Requisite DIP Lenders:** | DIP Lenders holding more than 50.0% of the DIP Commitments, which shall include each of both Brigade and SSIG for so long as such institutions and/or their affiliates are DIP Lenders (the "Requisite DIP Lenders"), except as to matters requiring unanimity under the DIP Credit Agreement (*e.g.*, the reduction of interest rates, the extension of interest payment dates, the reduction of fees, the extension of the maturity of the Borrower's obligations, any change in the superpriority status of the Borrower's and Guarantors' obligations under the DIP Facility and the release of all or substantially all of the DIP Collateral). |
| **Miscellaneous:** | The DIP Credit Agreement will include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, payments free and clear of withholding taxes and customary EU bail-in provisions). |
| **Governing Law:** | Except as governed by the Bankruptcy Code, the law of the State of New York. |
| **Counsel to the DIP Agent:** | Davis Polk & Wardwell LLP |
| **Counsel to the Ad Hoc Group:** | King & Spalding LLP |
| **Counsel to the Debtors:** | Weil, Gotshal & Manges LLP |

WEIL:\97352148\2\44444.0008

**Exhibit B**

**[FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS]**

This joinder agreement (the "***Joinder Agreement***") to the Restructuring Support Agreement dated January 22, 2020 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), between Fairway Group Holdings Corp. ("***Fairway***"), and its direct and indirect subsidiaries (each, a "***Company Party***" and collectively, the "***Company Parties***") and the [●] (together with their respective successors and permitted assigns, the "***Consenting Creditors***" and each, a "***Consenting Creditor***") is executed and delivered by _____ (the "***Joining Party***") as of _____, 2020. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

Representations and Warranties.  With respect to the aggregate principal amount of [●] set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 7 of the Agreement to each other Party to the Agreement.

Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

**[CONSENTING CREDITOR]**

By: _____

    Name:

    Title:

Principal Amount of the [●]:  $ _____

Notice Address:

_____

_____

_____

Fax: _____

Attention: _____

E-mail: _____

Acknowledged:


**Fairway Group Holdings Corp.**
on its own behalf and on behalf of its direct and
indirect debtor subsidiaries



By:_____
    Name:
    Title:

## **Schedule 1**

**Committees**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no official committee has been organized prior to the Commencement Date.

## Schedule 2

### Consolidated List of 40 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Commencement Date, the forty (40) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 1 | United Natural Foods, Inc. d/b/a Cornuco | Attn.: Lisa Franchette<br>313 Iron Horse Way<br>Providence, Rhode Island 02908<br>Phone: (603) 256-3000<br>E-mail: lfranchette@unfi.com | Trade Vendor | $1,838,914.71 | |
| 2 | Douglaston Shopping Center Owner LLC | Attn.: John Birnbaum<br>f/k/a AAC Management Corp.<br>150 East 58th Street, 39th Floor<br>New York, New York 10155<br>Phone: (646) 214-0271<br>　　　　(212) 213-4444 (Ext. 211)<br>Email: jbirnbaum@aacrealty.com<br>　　　　lostrow@aacrealty.com | Rent | $961,244.09 | Disputed |
| 3 | West Side Foods, Inc. | Attn.: Tom Ryan<br>　　　　Tuttie Langston<br>355 Food Center Drive<br>Hunts Point Co-Op Market, Building E<br>Bronx, New York 10474<br>Phone: (917) 417-8242 / (718) 842-8500<br>E-mail: tryan@westsidefoodsinc.com<br>　　　　tuttie@westsidefoodsinc.com | Trade Vendor | $957,644.91 | |
| 4 | UFCW Local 1500 Welfare Fund | Attn.: Robert Newell<br>425 Merrick Avenue<br>Westbury, New York 11590<br>Phone: (800) 522-0456<br>E-mail: rnewell@ufcw1500.org | Union - Benefits | $753,742.66 | |
| 5 | UFCW Local 1500 Pension Plan | Attn.: Robert Newell<br>425 Merrick Avenue<br>Westbury, New York 11590<br>Phone: (800) 522-0456<br>E-mail: rnewell@ufcw1500.org | Union - Benefits | $711,357.78 | |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

WEIL:\97260920\10\44444.0008

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 6 | Maplebear, Inc. d/b/a Instacart | Attn.: Aarron Levitan<br>          Andrew Nodes<br>50 Beale Street, 6th Floor<br>San Francisco, California 94105<br>Phone: (847) 363-1985 / (202) 309-2189<br>E-mail: aaron.levitan@instacart.com<br>          andrew.nodes@instacart.com | Trade Vendor | $697,954.10 | |
| 7 | Albert's Organics Inc. | Attn.: Sue Tamm<br>1155 Commerce Boulevard<br>Logan Township, New Jersey 08085<br>Phone: (856) 491-0197 / (856) 241-9090<br>E-mail: stamm@albertsfreshproduce.com<br>          aoer@albertsorganics.com | Trade Vendor | $637,273.84 | |
| 8 | US Foodservice, Inc. | Attn.: Hank Smith<br>1051 Amboy Avenue<br>Perth Amboy, New Jersey 08861<br>Phone: (516) 993-9946 / (800) 222-1278<br>Email: hank.smith@usfoods.com<br>          nymarreequests@usfoods.com<br>          andy.rainone@usfoods.com | Trade Vendor | $570,057.58 | |
| 9 | S. Katzman Produce Inc. | Attn.: Mario Andreani<br>213 NYC Terminal Market<br>Bronx, New York 10474<br>Phone: (516) 805-5804 / (718) 991-4700<br>Email: mandreani@katzmanproduce.com<br>accountsreceivable@katzmanproduce.com<br>accountsreceivable@katzmanberry.com | Trade Vendor | $562,898.99 | |
| 10 | J & J Farms Creamery Co., Inc. | Attn.: Morris Glauber<br>57-48 49th Street<br>Maspeth, New York 11378<br>Phone: (718) 490-7236 / (718) 821-1200<br>Email: morris@jj-farms.com<br>          abek@jj-farms.com | Trade Vendor | $476,156.13 | |
| 11 | Manetto Hills Associates 116, LLC | Attn.: Barbara Briamonte<br>500 North Broadway, Suite 201<br>P.O. Box 9010<br>Jericho, New York 11753<br>Phone: (516) 869-7157<br>Email: bbriamonte@kimcorealty.com | Rent | $444,560.96 | |
| 12 | Bunzl Distribution Northeast, LLC | Attn.: Dave Maszezak<br>27 Distribution Way<br>Monmouth, New Jersey 08852<br>Phone: (732) 821-7000<br>Email: dave.maszezak@bunzlusa.com | Trade Vendor | $394,115.10 | |

3

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 13 | Oxford Health Insurance, Inc. | Attn.: Lisa D. Coleman<br>One Penn Plaza, 8th Floor<br>New York, New York 10119<br>Phone: (212) 912-4016<br>Email: lcoleman@uhc.com | Insurance | $345,944.99 | |
| 14 | Dora's Natural, Inc. | Attn.: Cyrus Schwartz<br>21 Empire Boulevard<br>South Hackensack, New Jersey 07606<br>Phone: (201) 229-0500<br>Email: cyruss@dorasnaturals.com<br>melissah@dorsnaturals.com | Trade Vendor | $323,663.14 | |
| 15 | Red Hook Green Power, LLC | Attn.: Leila Zubi<br>c/o The O'Connell Organization<br>175 Van Dyke Street, Suite 322A<br>Brooklyn, New York 11231<br>Phone: (212) 202-0954<br>Email: lzubi@zubirosner.com | Utility | $322,099.38 | Disputed |
| 16 | Seven Yale & Towne, LLC | Attn.: David Fife<br>c/o Building and Land Technology<br>1 Elmcroft Road, Suite 500<br>Hartford, Connecticut 06103-3494<br>Phone: (203) 644-1526<br>Email: dfwaters@bltoffice.com | Rent | $301,745.66 | |
| 17 | 229 West 74th Street Corp. | Attn.: Lucius Palmer<br>c/o Mt. Pleasant Management Corp.<br>855 Lexington Avenue<br>New York, New York 10065<br>Phone: (212) 570-2030<br>Email: lpalmer@thebeekmanestate.com | Rent | $291,160.12 | |
| 18 | Austin Meat & Seafood Company | Attn.: Mike Johnson<br>Joel Wartell<br>Liz Ponce<br>355 Food Center Drive<br>Hunts Point Co-Op Market<br>Building A-14<br>Bronx, New York 10474<br>Phone: (718) 842-6767<br>Email: mike.johnson@austinmeat.com<br>joel.wartell@austinmeat.com<br>liz.ponce@austinmeat.com | Trade Vendor | $263,721.58 | |
| 19 | Donald Myers Produce, Inc. | Attn.: Donald Myer<br>1088 North Main Road<br>Vineland, New Jersey 08360<br>Phone: (856) 692-4084<br>Email: dmyersproduce@comcast.net<br>fmartine07@gmail.com | Trade Vendor | $259,189.55 | |

4

WEIL:\97260920\10\44444.0008

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 20 | Blue Ribbon Fish Co., Inc. | Attn.: David Samuels<br>800 Food Center Drive, Unit 67<br>Bronx, New York 10474<br>Phone: (718) 620-8580<br>Email: david.blueribbon@gmail.com | Trade Vendor | $242,321.42 | |
| 21 | Cedro Bananas Wholesale Distributor | Attn.: William Mascari<br>99 Laura Street<br>New Haven, Connecticut 06512<br>Phone: (203) 996-9454 / (203) 469-9366<br>E-mail: billy@cedrobananas.com<br>lucy@cedrobanans.com | Trade Vendor | $229,777.05 | |
| 22 | Mama Mia Produce LLC | Attn.: Shimon Efergan<br>P.O. Box 505<br>East Rutherford, New Jersey 07073<br>Phone: (917) 686-7061 / (973) 773-9494<br>Email: e.shimon@mamamiaproduce.com<br>f.olubunmi@mamamiaproduce.com<br>ar@mamamiaproduce.com | Trade Vendor | $229,520.50 | |
| 23 | Post Road Plaza Leasehold LLC | Attn.: Robert Carson<br>c/o Levin Management Corp.<br>975 US Highway 22 West<br>North Plainfield, New Jersey 07060<br>Phone: (908) 755-7489<br>Email: ach-receipts@levinmgt.com<br>brand@levinmgt.com | Rent | $228,514.38 | |
| 24 | M B Food Processing Inc. | Attn.: Dean Koplik<br>4 Trolley Road<br>South Fallsburg, New York 12779<br>Phone: (845) 434-5051 (Ext. 16)<br>Email: deank@murrayschicken.com | Trade Vendor | $213,402.11 | |
| 25 | Wonderful Citrus Cooperative | Attn.: James Lopez<br>1901 South Lexington Street<br>Delano, California 93215<br>Phone: (856) 603-2200 / (661) 720-2452<br>Email: james.lopez@wonderful.com | Trade Vendor | $207,154.50 | |
| 26 | Imperial Bag & Paper Co. LLC d/b/a Imperial Dade | Attn.: Jeff Burdick<br>255 Route 1&9<br>Jersey City, New Jersey 07306<br>Phone: (201) 437-7440 (Ext. 3160)<br>Email: cmerced@imperialdade.com<br>fgold@imperialbag.com | Trade Vendor | $198,341.08 | |

WEIL:\97260920\10\44444.0008

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 27 | DHH Company, LLC | Attn.: Howard Glickberg<br>Veronica Paverman<br>c/o Paverman & Paverman CPA PC<br>2525 Palmer Avenue<br>New Rochelle, New York 10801<br>Phone: (917) 709-3492 / (914) 633-6920<br>Email: fishatuna@aol.com<br>vpaverman@pavermancpa.com | Rent | $180,492.41 | |
| 28 | Liberty Coca-Cola Beverages LLC | Attn.: Roseann Messano<br>725 East Erie Avenue<br>Philadelphia, Pennsylvania 19134<br>Phone: (201) 838-6327<br>Email: messano@libertycoke.com<br>libertycashapp@coca-cola.com<br>hleal@coke-bsna.com<br>ccosme@coke-bsna.com | Trade Vendor | $180,458.60 | |
| 29 | Red Hook Stores, LLC | Attn.: Greg O'Connell<br>175 Van Dyke Street, Suite 322A<br>Brooklyn, New York 11231<br>Phone: (718) 624-0160<br>Email: greg@redhookwaterfront.com | Rent | $171,908.46 | |
| 30 | XPO Courier, LLC d/b/a XPO Logistics | Attn.: Ralph Whitty<br>Arthur Lagrega<br>229 West 36th Street<br>New York, New York 10018<br>Phone: (646) 454-3877 / (646) 454-3855<br>Email: ralph.whitty@xpo.com<br>arthur.largrega@xpo.com | Trade Vendor | $171,179.85 | |
| 31 | Giorgio Fresh Co. | Attn.: Legal Department<br>P.O. Box 8500-52948<br>Philadelphia, Pennsylvania 19179-2948<br>Phone: (610) 926-2800 (Ext. 8375)<br>Email: gfccustomersvc@giorgiofoods.com | Trade Vendor | $161,227.06 | |
| 32 | Valesco Trading | Attn.: Al Sozer<br>60 Saddle River Avenue, Unit D<br>South Hackensack, New Jersey 07606<br>Phone: (646) 338-5604 / (201) 729-1414<br>Email: aos@valescofoods.com | Trade Vendor | $159,027.53 | |
| 33 | 2328 on Twelfth, LLC | Attn.: Howard Glickberg<br>Veronica Paverman<br>c/o Paverman & Paverman CPA PC<br>2525 Palmer Avenue<br>New Rochelle, New York 10801<br>Phone: (917) 709-3492 / (914) 663-6920<br>Email: fishatuna@aol.com<br>vpaverman@pavermancpa.com | Rent | $158,381.83 | |

6

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 34 | Levco Route 46 Associates | Attn.:  Michael Mandelbaum c/o Mandelbaum 80 Main Street, Suite 510 West Orange, New Jersey 07502 Phone:  (973) 325-0011 E-mail:  michaelm@mandelbaumfirm.com | Rent | $157,952.65 | |
| 35 | Nestle Waters North America Inc. | Attn.:  Jim Gorman 2 Van Riper Road Montvale, New Jersey 07645 Phone:  (516) 317-0216 / (203) 629-7489 Email:  jgorman@esmferolie.com | Trade Vendor | $153,680.15 | |
| 36 | Calavo Growers Inc. | Attn.:  Richard Joyal 1141A Cummings Road Santa Paula, California 93060 Phone:  (805) 921-3213 Email:  rickj@calavo.com | Trade Vendor | $153,671.75 | |
| 37 | Georgetowne Center Brooklyn LLC | Attn.:  Marc Geller c/o Sholom & Zuckerbrot Realty LLC 35-11 35th Avenue Long Island, New York 11106 Phone:  (718) 392-5959 Email:  mgeller@s-z.com | Rent | $150,440.46 | |
| 38 | Cibo Vita Inc. | Attn.:  Emre Imamoglu 12 Vreeland Avenue Totowa, New Jersey 07512 Phone:  (862) 238-8020 Email:  emre@cibovita.com | Trade Vendor | $143,595.14 | |
| 39 | World's Best Cheeses, Inc. | Attn.:  Legal Department 111 Business Park Drive Armonk, New York 10504 Phone:  (800) 922-4337 Email:  kathy@wbcheese.com | Trade Vendor | $140,975.92 | |
| 40 | Adams Apple Fruits and Vegetables LLC | Attn.:  Avi Sharon 1071 Duston Road Valley Stream, New York 11581 Phone:  (917) 559-5584 Email:  adamsapplellc@gmail.com | Trade Vendor | $139,404.20 | |

WEIL:\97260920\10\44444.0008

**Schedule 3**

**Consolidated List of Holders of Five Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Commencement Date, the five (5) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31).

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Amount of Claim | Type of Collateral | Estimated Value of Collateral | Whether Claim or Lien is Disputed |
|---|---|---|---|---|---|---|
| 1 | Ankura Trust Company, LLC, as Administrative Agent and Collateral Agent | Attn.:  Ryan Roy<br>60 State Street, Suite 700<br>Boston, MA 02109<br>Phone:  (617) 878-2031<br>Email:  ryan.roy@ankura.com | $227, 215,377 | Substantially All Assets | "Unknown" | No |
| 2 | Ventura in Manhattan, LLC | Attn.:  Mark Faraldo,<br>c/o L&B Realty Advisors, LLC<br>Executive Vice President<br>8750 North Central Expressway, Suite 800<br>Dallas, TX 75231<br>Phone:  (214) 989-0820<br>Email:  mgarrett@roseny.com<br><br>*With copy to:*<br>Attn:  Eric H. Kahan, Esq.<br>Sperber Denenberg & Kahan, P.C.<br>48 West 37th Street, 16th Floor<br>New York, NY 10018<br>Phone:  (917) 351-1335 x216 | $4,500,000 | Letter of Credit | $4,500,000 | No |
| 3 | DFD Development Limited Partnership | Attn:  Evan Stein<br>c/o M.D. Carlisle Realty<br>352 Park Avenue South, 15th Floor<br>New York, New York 10010<br>Phone:  212-689-0639<br>Email:  estein@mdcarlisle.com<br><br>*With copy to:*<br>Attn.:  David Calabrese, Esq.<br>Bryan Cave LLP<br>1290 Avenue of the Americas<br>New York, New York 10104 | $3,575,000 | Letter of Credit | $3,575,000 | No |
| 4 | C&S Wholesale Grocers | Attn.:  Michael Duffy,<br>Chief Executive Officer<br>7 Corporate Drive<br>Keene, NH 03431<br>Email:  mduffy@cswg.com<br>Phone:  (603) 354-4702 | $3,400,000 | Letter of Credit | $3,400,000 | No |

8

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Amount of Claim | Type of Collateral | Estimated Value of Collateral | Whether Claim or Lien is Disputed |
|---|---|---|---|---|---|---|
| 5 | JMM Raceway, LLC; Mattone Group, LLC; and Gart Roosevelt Associates, LLC as Tenants in Common | c/o Mattone Group LLC<br>134-01 20th Avenue<br>College Point, NY 11356<br>Phone: (718) 353-5500<br><br>*With copy to:*<br>Attn.: Michael Mattone<br>Marine Estates LLC<br>c/o Rose Associates, Inc.<br>200 Madison Avenue<br>New York, NY 10016<br>Phone: (212) 210-6666 | $1,913,996 | Letter of Credit | $1,913,996 | No |

9

## Schedule 4

## Condensed Consolidated Balance Sheet (Unaudited)

## As of December 1, 2019

**FAIRWAY GROUP HOLDINGS CORP.**
**CONSOLIDATED BALANCE SHEETS**
($ in thousands)

|  | Dec 1, 2019 |
|---|---|
| **ASSETS** | (Unaudited) |
| CURRENT ASSETS: | |
| Cash and cash equivalents | $ 11,503 |
| Accounts receivable, net of allowance for doubtful accounts | 3,400 |
| Merchandise Inventory | 24,311 |
| Income tax receivable | 1,077 |
| Prepaid rent | 1,884 |
| Prepaid expenses and other current assets | 6,331 |
| Total current assets | 48,506 |
| PROPERTY AND EQUIPMENT - Net | 55,667 |
| INTANGIBLE ASSETS - Net | 34,709 |
| OTHER ASSETS | 19,985 |
| TOTAL ASSETS | $ 158,867 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | |
| CURRENT LIABILITIES: | |
| Current portion of long-term debt | $ - |
| Accounts payable | 28,528 |
| Accrued expenses and other current liabilities | 22,194 |
| Total current liabilities | 50,722 |
| OTHER LIABILITIES: | |
| Long-term debt, less current portion | 221,949 |
| Other long-term liabilities | 14,296 |
| Total other liabilities | 238,027 |
| Total liabilities | 288,749 |
| STOCKHOLDERS' DEFICIT: | |
| Common stock B | - |
| Additional paid-in capital | 67,377 |
| Retained deficit | (197,259) |
| Total stockholders' Deficit | (129,882) |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 158,867 |

10

## Schedule 5

**Publicly Held Securities**

   Pursuant to Local Rule 1007-2(a)(7), no shares of stock, debentures, and other securities ("**Securities**") of the Debtors are publicly held.  The Securities held by the Debtors' directors and officers are listed separately below.

**Fairway Group Holdings Corp. Common Stock Held by the Debtors' Executive Officers**

| Name of Non-Employee Director | Approximate Number of Shares[2] | As of |
|---|---|---|
| N/A | N/A | N/A |

**Fairway Group Holdings Corp. Common Stock Held by the Debtors' Employee Directors**

| Name of Non-Employee Director | Approximate Number of Shares[3] | As of |
|---|---|---|
| N/A | N/A | N/A |

---

[2] Only includes stock directly owned by the director.

[3] Only includes stock directly owned by the director.

11

## Schedule 6

### Debtors' Property Not in the Debtors' Possession

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including vendors, shippers, common carriers, materialmen, distributors, warehousemen, fulfillment houses, service providers, custodians, public officers, or agents, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

WEIL:\97260920\10\44444.0008

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

### Leased Property[4]

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Fairway Bakery LLC | 400 Walnut Avenue | Bronx | NY | 10454 | USA |
| Fairway Broadway LLC | 2121-2127 Broadway | New York | NY | 10023 | USA |
| Fairway Broadway LLC | 2131 Broadway | New York | NY | 10023 | USA |
| Fairway Chelsea LLC | 55 W 25th Street a/k/a 766 Avenue of the Americas | New York | NY | 10010 | USA |
| Fairway Douglaston LLC | 242-02 61st Avenue | Douglaston | NY | 11362 | USA |
| Fairway East 86th Street LLC | 230-240 E. 86th Street | New York | NY | 10022 | USA |
| Fairway Georgetowne LLC | 2149 Ralph Avenue | Brooklyn | NY | 11234 | USA |
| Fairway Group Plainview LLC | 50 Manetto Hill Road | Plainview | NY | 10023 | USA |
| Fairway Kips Bay LLC | 542-580 Second Avenue | New York | NY | 10016 | USA |
| Fairway Paramus LLC | #4 Fashion Center Mall Route 17 North 30 Ridgewood Avenue | Paramus | NJ | 07652 | USA |
| Fairway Pelham LLC | 847 Pelham Parkway | Pelham Manor | NY | 10803 | USA |
| Fairway Red Hook LLC | 480-500 Van Brunt Street | Brooklyn | NY | 11231 | USA |
| Fairway Red Hook LLC | 475 Van Brunt Street | Brooklyn | NY | 11231 | USA |
| Fairway Red Hook LLC | 264 Conover Street | Brooklyn | NY | 11231 | USA |
| Fairway Stamford LLC | 689 Canal Street | Stamford | CT | 06902 | USA |
| Fairway Stamford LLC | 699 Canal Street | Stamford | CT | 06902 | USA |
| Fairway Staten Island LLC | Staten Island Mall | Staten Island | NY | 10314 | USA |

---

[4] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

13

| | | | | | |
|---|---|---|---|---|---|
| Fairway Uptown LLC | 2276 12th Avenue | New York | NY | 10027 | USA |
| Fairway Uptown LLC | 2284-2286 12th Avenue | New York | NY | 10027 | USA |
| Fairway Uptown LLC | 2288-2312 12th Avenue | New York | NY | 10027 | USA |
| Fairway Uptown LLC | 2314 12th Avenue | New York | NY | 10027 | USA |
| Fairway Uptown LLC | 2316 12th Avenue | New York | NY | 10027 | USA |
| Fairway Uptown LLC | 2328 12th Avenue | New York | NY | 10027 | USA |
| Fairway Westbury LLC | 1258 Corporate Drive | Westbury | NY | 11590 | USA |
| Fairway Woodland Park LLC | 1510 Route 46 West | Woodland Park | NJ | 07424 | USA |

14

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of December 1, 2019, the Debtors had assets of approximately $159 million, as provided in Schedule 4, with substantial assets in New York, New Jersey and Connecticut.

### Books and Records

The Debtors' books and records are located at 2284 12th Avenue, New York NY 10027.

### Debtors' Assets Outside the United States

The Debtors do not have assets located outside of the territorial limits of the United States.

15

**Schedule 9**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

16

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
| --- | --- |
| Abel Porter<br>*Chief Executive Officer* | Abel Porter joined as Fairway's Chief Executive Officer in March 2017. Mr. Porter has spent his entire career working in the grocery industry. Mr. Porter began his career in the grocery industry as a stock boy at Smith's Food and Drug ("**Smith's**"), working his way up to President, and ultimately, Chief Executive Officer of Smith's. Mr. Porter retired from Smith's in 1999. Mr. Porter then served as President of Sullivan Family of Companies from 2001 to 2014. Mr. Porter continues to serve on the board of Associated Food Stores of Salt Lake City. Mr. Porter received his Bachelor of Finance from Brigham Young University. |
| Brad Schneider<br>*Chief Financial Officer* | Brad Schneider joined as Fairway's Chief Financial Officer since May 2019. Mr. Schneider is responsible for the oversight and daily operation of the finance, accounting, treasury, payroll, and IT functions at Fairway. Prior to joining Fairway, Mr. Schneider served as CFO of Luxury Dining Group, LLC and as the Director of Portfolio Patriarch Partners, LLC. Mr. Schneider received his Bachelor of Arts form Franklin and Marshall College and a Master of Business Administration from Harvard Business School. |
| Nathalie Augustin<br>*Senior Vice President and General Counsel* | Nathalie Augustin has served as Fairway's Senior Vice President – General Counsel and Secretary since April 2012. Ms. Augustin joined Fairway in June 2007 as Vice President – General Counsel and Secretary. Prior to joining Fairway, Ms. Augustin served in various capacities at The Donna Karan Company LLC, an international fashion design house and a subsidiary of LVMH Moët Hennessy Louis Vuitton, from June 1999 to May 2007, most recently as Vice President and Associate General Counsel. Prior to joining Donna Karan, Ms. Augustin was an associate at Cleary Gottlieb Steen & Hamilton LLP for approximately 5 years. Ms. Augustin began her legal career as a law clerk to the Honorable Sterling Johnson of the United States District Court for the Eastern District of New York. She received her Juris Doctor from Harvard Law School and a Bachelor of Arts degree from Columbia College. |

WEIL:\97260920\10\44444.0008

| Name & Position | Responsibilities & Experience |
|---|---|
| Maureen Page<br>*Vice President – Finance* | Maureen Page joined Fairway in October 2007.  Ms. Page has served in various capacities and rules throughout Fairway, including, Director of financial Planning and Analysis, Corporate Controller, and Senior of Tax and Treasury.  Prior to Fairway, Ms. Page served as Vice President and Corporate controller at Aerogroup International and Vitamin Shoppe Industries, among others.  Ms. Page received her Bachelor of Science in Business Administration from Montclair State University. |

WEIL:\97260920\10\44444.0008

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $10 million |
| **Payments to Officers, Stockholders, and Directors** | $125,000 |
| **Payments to Financial and Business Consultants** | $0 |

19

## Schedule 12

### Cash Receipts and Disbursements,
### Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts[1]** | $61,129,737 |
| **Cash Disbursements** | $56,562,151 |
| **Net Cash Gain[1]** | $4,567,586 |
| **Unpaid Obligations** | $7,595,124 |
| **Uncollected Receivables[2]** | $2,400,000 |

*Notes:*
1.     *Receipts and Cash include $15 million in DIP financing proceeds*
2.     *Reflects 1-2 days of credit card collections*